# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

CHRISTIAN BRUCKNER, et al.,

          Plaintiffs,          Case No.: 8:22-cv-1582-KKM-SPF

  v.

JOSEPH R. BIDEN, JR., et al.,

          Defendants.

## MOTION FOR PRELIMINARY INJUNCTION CHALLENGING THE CONSTITUTIONALITY OF THE INFRASTRUCTURE INVESTMENT AND JOBS ACT

## MOTION

Under Federal Rule of Civil Procedure 65, Plaintiffs move for an injunction prohibiting Defendants from implementing the race and gender quota in Section 11101(e)(3) of the Infrastructure Investment and Jobs Act.

## LEGAL MEMORANDUM

Once again, the Biden Administration plans to spend billions of tax dollars based on race and gender. The plan under review here is hardly an outlier. In *Vitolo v. Guzman*, the Sixth Circuit halted the Administration's efforts to exclude white male restaurant owners from obtaining $28.6 billion in much-needed COVID relief. *See* 999 F.3d 353 (6th Cir. 2021). In *Faust v. Vilsack,* the Western District of Wisconsin stopped the Administration's plan

to forgive $4 billion in farm loans only for non-white farmers. *See* 519 F. Supp. 3d 470 (W.D. Wis. 2021). Courts around the country have enjoined these discriminatory programs, including this Court. *Wynn v. Vilsack*, 545 F. Supp. 3d 1271 (M.D. Fla. 2021)*; see also Greer's Ranch Cafe v. Guzman*, 540 F. Supp. 3d 638 (N.D. Tex. 2021); *Holman v. Vilsack*, 2021 WL 2877915 (W.D. Tenn. 2021); *Miller v. Vilsack*, No. 4:21-cv-0595-O (N.D. Tex. July 1, 2021).

Now, in the $1.2 trillion "Infrastructure Investment and Jobs Act," Defendants are set to spend billions more based on race and gender. The provision at issue in this case is a 10% set aside for women and certain minorities. Under Section 111001(e)(3) of the Act, Defendants must reserve at least 10% of surface transportation funds (amounting to $37 billion) for "small business concerns" owned and controlled by "socially and economically disadvantaged individuals." Only women and the following racial groups qualify as presumptively "disadvantaged" under the Act: "Black Americans," "Hispanic Americans," "Native Americans," "Asian Pacific Americans," and "Subcontinent Asian Americans." Only they may compete for these funds.

Plaintiff Christopher Bruckner does not belong to any of these favored groups. He is a disabled immigrant from Romania who owns a small business in Tampa. But because he is a white male, Bruckner is ineligible to receive any government contracts funded by this $37 billion race-and-gender set aside.

As with the previous discriminatory programs struck down by courts, this set aside is unconstitutional and should be enjoined. Defendants' justification for this race-and-gender spending quota—generalized discrimination in the transportation industry—is not enough to justify discrimination against Bruckner and his small business. And regardless of the government's interest here, the set aside is not narrowly tailored because it ignores race- and gender-neutral alternatives while at the same time being overinclusive and underinclusive. It's a sloppy remedy to solve a vague and imprecise problem. As such, it cannot pass constitutional scrutiny.

## FACTS

On November 15, 2021, President Biden signed into law the "Infrastructure Investment and Jobs Act," P.L. 117-58 (referred to in this brief as the "Infrastructure Act").[1] Section 11101(e) of the Act provides:

> Except to the extent that the Secretary determines otherwise, not less than 10 percent of the amounts made available for any program under this division (other than section 14004), division C, and section 403 of title 23, United States Code, shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals.

This section applies to "more than $370 billion" appropriated for surface-transportation projects by the Federal Highway Administration (highways, roads, bridges, and similar projects), Federal Transit Administration (buses

---

[1] Available here: https://www.congress.gov/bill/117th-congress/house-bill/3684/text.

and other transit projects), and the National Highway Traffic Safety Administration (highway safety research and development).[2] Doc. 1, ¶16. In all, the White House announced that under this 10% race-and-gender quota, at least $37 billion is reserved for certain small businesses. Doc. 1, ¶¶1, 15, 16.

The beneficiaries of this set aside are women and some (but not all) racial minorities: "small business concerns" owned and controlled by "socially and economically disadvantaged" individuals. Doc. 1, ¶15. The Infrastructure Act adopts definitions from the Small Business Act, including the definitions "socially disadvantaged" and "economically disadvantaged." 15 U.S.C. § 637(d); Doc. 1, ¶17. The Act also specifically includes women in this definition: "women shall be presumed to be socially and economically disadvantaged for purposes of this subsection." *See* Infrastructure Act, § 11101(e)(2)(B).

Under these definitions, in addition to women, only the following racial or ethnic groups are presumptively "socially disadvantaged":

1. Black Americans
2. Hispanic Americans
3. Native Americans (Alaska Natives, Native Hawaiians, or enrolled members of a Federally or State recognized Indian Tribe)
4. Asian Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the

---

[2] *See generally* Doc. 1, ¶¶ 1, 14–17 (citing White House Briefing Room, "Bipartisan Infrastructure Law Will Revitalize Main Street," https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/23/fact-sheet-the-bipartisan-infrastructure-law-will-revitalize-main-street/.)

Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru)

5. Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal).

13 C.F.R. § 124.103. Individuals not included within these five groups are not presumptively "socially disadvantaged," and therefore not "economically disadvantaged." Under the regulations, someone "economically disadvantaged" must first be "socially disadvantaged." To defeat the presumption of *not* being "socially disadvantaged," disfavored individuals and groups may "petition the SBA" by proving a complex set of factors with "substantial evidence," although regulations and the SBA website do not lay out any discernable process for this petition. 13 C.F.R. § 124.103(c) & (d); *see Vitolo*, 999 F.3d at 357–8 (describing this process).

The women and minorities who meet this complex definition are "socially disadvantaged" and eligible to qualify as "economically disadvantaged" if they meet the SBA's income and asset qualifications. 13 C.F.R. § 124.104. Finally, if these "socially and economically disadvantaged" women and minorities own or control a "small business concern," then they are eligible for contracts funded by the set aside. *See* Infrastructure Act, § 11101(e).

This type of explicit race and gender quota is almost always unconstitutional. Congress attempted to justify it here through "findings" written into the Act. According to these findings, "discrimination and related barriers continue to pose significant obstacles for minority- and women-owned

businesses seeking to do business in Federally assisted surface transportation markets across the United States." *See* Infrastructure Act, § 11101(e)(1)(A). But those findings do not come close to justifying explicit quotas.

Plaintiff Christian Bruckner is a white male who lives and works in Tampa, Florida. Doc. 1, ¶ 6. He is an immigrant who came to America in the 1970s to escape the communist regime in Romania. His parents wanted a better life for him in a country that values constitutional rights and the principle of equality under the law. In 1989, Bruckner was seriously injured in a car wreck and now he is permanently disabled. Bruckner has over 20 years of experience in government contracting and is qualified, willing, and able to be a contractor and subcontractor under the Infrastructure Act. *Id.*

Plaintiff Project Management Corporation (PMC) is a for-profit Florida corporation owned and controlled by Plaintiff Bruckner. Doc. 1, ¶ 7. PMC is based in Tampa, Florida, and certified by the SBA as a small business concern that operates in a "Historically Underutilized Business Zone." PMC can fulfill transportation and infrastructure-related contracts, including those contracts available under the Infrastructure Act. *Id.*

## ARGUMENT

### I.    Plaintiffs are likely to succeed on race discrimination claim.

The Constitution forbids "discrimination by the general government . . . against any citizen because of his race." *Gibson v. State of Mississippi*, 162 U.S.

565, 591 (1896). "A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). When confronted with such a racial classification, "[a]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995). "Under strict scrutiny, the government has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation omitted).

Racial classifications, like the one here, "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993). Such programs "are simply too pernicious to permit any but the most exact connection between justification and classification." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). No such "exact connection" exists here. Defendants cannot provide specific and concrete evidence supporting a compelling government interest or meet any of the settled standards of narrow tailoring. In fact, Plaintiffs are unaware of any court that has upheld such a broad, race-based program. The program should be enjoined immediately before the money is spent and cannot be recalled.

Defendants unquestionably impose racial classifications. The Infrastructure Law sets aside 10% for small businesses owned certain racial groups, *see* Infrastructure Act, §11101(e)(3), 13 C.F.R. § 124.103–.104, and Defendants are committed to this racial quota. *See* Doc. 1, ¶16. Plaintiff Bruckner is not in any of these groups and so he, and his business PMC, cannot benefit from this race-based presumption. Strict scrutiny, therefore, applies.

A.  **Generalized claims of "discrimination" and "obstacles" are not compelling government interests that justify explicit racial discrimination.**

To establish a compelling governmental interest in establishing race-based benefits, the government must point to "identified discrimination" "with some specificity" and with "a strong basis in evidence." *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) (citation omitted). In other words, a "generalized assertion of past discrimination in a particular industry or region is not adequate because it provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Id.* at 910. Using this type and quality of evidence, "the government has a compelling interest in remedying past discrimination only when three criteria are met." *See Vitolo*, 999 F.3d at 361 (6th Cir. 2021) (summarizing U.S. Supreme Court precedents).

First, the policy must target a "specific episode of past discrimination" rather than generalized discrimination throughout society or within an industry. *Id.; see Shaw*, 517 U.S. at 909; *City of Richmond v. J.A. Croson Co.*,

488 U.S. 469, 498 (1989); *Adarand*, 515 U.S. at 225. An allegation of generalized "societal discrimination" is "not adequate because it provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Shaw*, 517 U.S. at 909. "A strong basis in evidence cannot rest on an amorphous claim of societal discrimination, on simple legislative assurances of good intention, or on congressional findings of discrimination in the national economy." *Wynn*, 545 F. Supp. 3d at 1278.

In short, "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Shaw*, 517 U.S. at 909-910. Over several decades, the Supreme Court has repeatedly and frequently reaffirmed this basic principle that generalized claims of societal discrimination do not justify race-conscious government action. *See, e.g., Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 731 (2007); *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 310 (1978).

Second, there must be strong "evidence of *intentional* discrimination in the past." *Vitolo,* 999 F.3d at 361; *see Croson*, 488 U.S. at 503; *Parents Involved,* 551 U.S. at 702; ("remedying the effects of past intentional discrimination is a compelling interest."). A focus on intentional discrimination keeps litigation focused on discrete barriers that courts can manage rather than the ongoing maintenance of some supposedly optimal racial distribution of benefits. Relying on statistical disparities aims the government toward "racial

balancing," and this can never be a "compelling end in itself [because it] would effectively assure that race will always be relevant in American life, and that the ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race will never be achieved." *Id.* at 730 (citation omitted).

Third, if the government "show[s] that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of [a] local . . . industry," then the government can act to undo the discrimination. *Croson*, 488 U.S. at 492 (plurality opinion). It is not enough for the government to show it is simply "contracting in a marketplace where there is discrimination." *Webster v. Fulton Cnty., Ga.*, 51 F. Supp. 2d 1354, 1369 (N.D. Ga. 1999), *aff'd*, 218 F.3d 1267 (11th Cir. 2000). The government must prove that it "knowingly perpetuated the discrimination," and therefore became "a kind of joint tortfeasor, coconspirator, or aider and abettor." *Builders Ass'n of Greater Chicago v. Cnty. of Cook*, 256 F.3d 642, 645 (7th Cir. 2001).

Here, Defendants cannot meet any of these three required criteria.

First, Congress is not attempting to remedy a specific episode of discrimination. *See Shaw*, 517 U.S. at 909; *Croson*, 488 U.S. at 498; *Adarand*, 515 U.S. at 226. Congress has not pointed to a specific episode of discrimination, or even multiple "specific incidents of past discrimination," required to satisfy strict scrutiny. *Vitolo*, 999 F.3d at 361. Its findings vaguely

recount "discrimination and related barriers" in "federally assisted surface transportation markets across the United States." *See* Infrastructure Act, § 11101(e)(1)(A). These generalized assertions of past discrimination within the transportation industry. This is not enough: "[G]eneralized assertions of past discrimination within an industry afford no logical terminus for a remedy." *Peightal v. Metro. Dade Cnty.*, 26 F.3d 1545, 1553 (11th Cir. 1994). "[N]arrow tailoring" requires "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). Here, a reviewing court would have no way of determining whether a strict quota—not exactly the usual policy before the spate of race-based legislation passed in 2021—is necessary. Nor could it tell whether a 10% quota is the proper racial exclusion given past discrimination in the relevant marketplace.

Second, Congressional findings do not point to any "intentional" discrimination that Defendants may remedy with the 10% set aside. *See Parents Involved*, 551 U.S. at 702 ("remedying the effects of past *intentional* discrimination is a compelling interest") (emphasis added). While Congress says that "reports" and "news stories" support claims of discrimination or, at least, differing racial outcomes, there is little indication that Congress identified anything "intentional." Instead, Defendants will likely rely purely on statistical disparities. But "[s]tatistical disparities don't cut it." *Vitolo*, 999

F.3d at 361. Defendants must point to evidence of actual discrimination to justify their program of intentional discrimination against Plaintiffs.

Finally, congressional findings do not show that the federal government knowingly participated in discrimination. *Croson*, 488 U.S. at 492; *Builders Ass'n of Greater Chicago*, 256 F.3d at 645 ("knowingly perpetuated the discrimination"). Under *Croson,* Defendants must explain how they have become a "'passive participant' in a system of racial exclusion." *Croson,* 488 U.S. at 492. No such evidence exists here. And there is no evidence of recent discrimination. *E.g., Brunet v. City of Columbus*, 1 F.3d 390, 409 (6th Cir. 1993) (discrimination from 14 years earlier too remote to support affirmative action program); *Hammon v. Barry*, 826 F.2d 73, 76-77 (D.C. Cir. 1987) (discrimination from 18 years earlier too remote). Congress first imposed a 10% racial set aside in 1977 to remedy discrimination within the construction industry. *See Fullilove v. Klutznick*, 448 U.S. 448, 449 (1980) (abrogated by *Adarand*, 515 U.S. at 235–36). It strains all credulity that the federal government has imposed racial quotas since 1977, yet somehow still knowingly participates in intentional race discrimination in the construction industry.

Because Defendants cannot satisfy all three of these requirements, they cannot demonstrate a compelling governmental interest. This Court considered similar defenses in *Wynn*, when USDA claimed its race-based loan-forgiveness program was meant to remedy to the effects of past discrimination,

racial disparities in obtaining financing, and disproportionate rates of benefiting from prior relief. 545 F. Supp. 3d at 1278. But this Court rejected those generalized claims, explaining that the evidence "does not support a finding that USDA continues to be a participant, passive or active, in discrimination." *Id.* at 1279. This Court found no connection between racial disparities and "actual discrimination by USDA." *Id.* at 1281. Articulating a warning particularly relevant here, the Court wrote: "Courts must be wary of finding statistical disparities untethered to evidence of discrimination sufficient grounds for implementation of a race-based program." *Id.*

Similarly, in *Vitolo v. Guzman*, the Sixth Circuit considered a race-and-gender preference in the Restaurant Revitalization Fund. 999 F.3d 353. That Circuit rejected the government's reliance on "societal discrimination against minority businesses" because the evidence presented did not "identify specific instances of past discrimination." *Id.* at 361. The court also noted that the government offered little evidence of "past intentional discrimination against the many groups to whom it grants preferences." *Id.* Specifically, the court noted that "the schedule of racial preferences detailed in the government's regulation—preferences for Pakistanis but not Afghans; Japanese but not Iraqis; Hispanics but not Middle Easterners—is not supported by any record evidence at all." And the court found no evidence that the government "participated in the discrimination it seeks to remedy." *Id.* at 361-62.

The same is true here. The Infrastructure Act imposes a 10% race-based quota to address "discrimination." But Congress provides little more than vague claims which are likely based on little more than statistical disparities. The results are not tethered to a particular market nor do we know enough to assess what their remaining impact may be in these unnamed markets. We are told nothing about any federal role which must now be remediated. Whatever may be supporting these claims of "discrimination," Defendants cannot justify this racial quota unless they point to a specific episode of past intentional discrimination that the government had a hand in. Nothing in the Congressional findings support such a claim. Were there ever an attempt to build a system of rigid racial quotas based on generalized societal discrimination, this is it.

## B.     The Infrastructure Act's quota is not narrowly tailored.

A race-based remedy is "the strongest of medicines, with many potentially harmful side-effects, and must be reserved for those severe cases that are highly resistant to conventional treatment." *Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cnty.*, 122 F.3d 895, 927 (11th Cir. 1997). The narrow tailoring requirement ensures that "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493. Race-based remedies are only reserved for the "extreme case" when

necessary to "break down patterns of deliberate exclusion." *Id.* at 509. Government policies "striving for racial parity rather than an end to racial discrimination" will ultimately fail the narrow tailoring analysis. *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1570 (11th Cir. 1994).

In the Eleventh Circuit, courts consider the following four broad factors: "(1) the necessity for the relief and the efficacy of alternative remedies; (2) the flexibility and duration of the relief; (3) the relationship of numerical goals to the relevant labor market; and (4) the impact of the relief on the rights of innocent third parties." *Eng'g Contractors*, 122 F.3d at 927 (cleaned up).

Defendants cannot satisfy any of these criteria, let alone all four.

1. To prove necessity, the government must show "serious, good faith consideration of workable race-neutral alternatives." *Grutter,* 539 U.S. at 339; *Croson*, 488 U.S. at 507. "This requires the government to engage in a genuine effort to determine whether alternative policies could address the alleged harm." *Vitolo*, 999 F.3d at 362. Therefore, a court must not uphold a race-conscious policy unless it is "satisfied that no workable race-neutral alternative" would achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013); *Croson*, 488 U.S. at 507 (set-aside plan not narrowly tailored where "there does not appear to have been any consideration of the use of race-neutral means"). "The essence of the 'narrowly tailored'

inquiry is the notion that explicitly racial preferences . . . must be only a 'last resort' option." *Eng'g Contractors*, 122 F.3d at 926.

In *Croson,* the Court identified numerous alternatives to the City of Richmond's requirement that 30% of all prime contracts must be awarded to "minority business enterprises." 488 U.S. 469. "Simplification of bidding procedures, relaxation of bonding requirements, and training and financial aid for disadvantaged entrepreneurs of all races would open the public contracting market to all those who have suffered the effects of past societal discrimination or neglect." *Croson*, 488 U.S. at 509–10. Here, Congress considered no similar alternatives, such as outreach to minority groups, setting aspirational goals, helping all disadvantaged contractors regardless of race, or simply eliminating red tape. As the Court explained in *Croson*, many barriers "may be the product of bureaucratic inertia more than actual necessity, and may have a disproportionate effect on the opportunities open to new minority firms." *Id*.

Moreover, to the extent that Defendants are attempting to address race discrimination, they could step up their enforcement efforts to eliminate race discrimination in public contracting, which is a logical alternative to the explicit race discrimination in this program. *Id*. ("The city may also act to prohibit discrimination in the provision of credit or bonding by local suppliers and banks."); *Eng'g Contractors*, 122 F.3d at 928 ("County has not taken any

action whatsoever to ferret out and respond to instances of discrimination if and when they have occurred in the County's own contracting process").

Finally, and perhaps most importantly, if the government truly seeks to remedy past discrimination, then it should help those individuals who have been discriminated against. Yet Defendants make no effort to tailor their set aside to the *victims* of past race discrimination: they attempt to give a preference to *everyone* in the preferred racial categories (at the expense of innocent victims, like Bruckner) whether they are the victims of past discrimination or not.

What's more, a policy cannot be said to be "necessary" if it is either overinclusive or underinclusive in its use of racial classifications. *Croson*, 488 U.S. at 507–08; *Gratz*, 539 U.S. at 273–75. In the Infrastructure Act, only the following categories are eligible for a presumption of social disadvantage, and therefore eligibility for the 10% racial quota: "Black Americans," "Hispanic Americans," "Native Americans," "Asian Pacific Americans," and "Subcontinent Asian Americans."

To defend these racial categories, Defendants must demonstrate evidence-specific episodes of intentional discrimination against each racial category, otherwise the remedy is overinclusive. *Vitolo*, 999 F.3d at 361 (racial designations must be "informed by data that suggest intentional discrimination"). As the Court in *Croson* rightfully pondered, if the law was

narrowly tailored "to compensate black contractors for past discrimination, one may legitimately ask why they are forced to share this remedial relief with an Aleut citizen who moves to Richmond tomorrow?" *Croson,* 488 U.S. at 506. The "random inclusion of racial groups for which there is no evidence of past discrimination in the construction industry raises doubts about the remedial nature of the Act's program." *O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 427 (D.C. Cir. 1992) (citation omitted).

On the other hand, the Infrastructure Act's racial categories will be deemed underinclusive if Defendants fail to justify the exclusion of certain racial groups. "When the government promulgates race-based policies, it must operate with a scalpel." *Vitolo*, 999 F.3d at 361. Here, Defendants' racial categories appear to be created with a meat cleaver. Under the Infrastructure Act, only individuals with ancestors from two Asian regions are deemed Asians worthy of assistance: the "Asian Pacific" region and the "Subcontinent Asian" region. 13 C.F.R. § 124.103.

Asians in other regions are excluded without any justification. For example, Asians from the Mediterranean to India are excluded (Turkey, Lebanon, Syria, Jordan, Iraq, Iran, Afghanistan, and Pakistan). Asians from the Arabian Peninsula are excluded (Saudi Arabia, Kuwait, Yemen, Oman, Qatar, Bahrain, and UAE). Asians from North Asia are also left out (Kazakhstan, Uzbekistan, Turkmenistan, Kyrgyzstan, Tajikistan, and

Mongolia). Defendants have a lot of explaining to do. They must, for example, explain why Asians from Malaysia can participate in the set aside, yet Asians from East Timor (a bordering country) cannot.

Individuals with ancestors in Africa are likewise divided up without explanation. North Africans (Egypt, Libya, Tunisia, Algeria, and Morocco) do not count. *See* 32 C.F.R. § 191.3 ("A [white] person [has] origins in any of the original peoples of . . . North Africa."); 28 C.F.R. § 42.402 (same). And in our own hemisphere, individuals with origins in Central and South America are divided up based on country of origin. The Infrastructure Act only recognizes those individuals identified as "Hispanic," that is, deriving from Spanish-speaking countries. *See, e.g.,* 34 C.F.R. § 607.7. According to the Infrastructure Act, a contractor whose parents are from Venezuela is "socially disadvantaged" (Hispanic) but not a contractor whose parents are from Brazil (not Hispanic). Defendants must explain this difference "informed by data that suggest intentional discrimination" (or the lack thereof). *Vitolo*, 999 F.3d at 361.

If Defendants' goal is to end discrimination against all minorities in the "Federally assisted surface transportation markets across the United States" (*see* Infrastructure Act, § 11101(e)(1)(A)), then why do Defendants inexplicably pick among some Asians and not others, some Africans and not others, some Central and South Americans and not others? This is not narrow tailoring.

2. Under the second factor, "flexibility and duration," the race-based quota also fails narrow-tailoring analysis. Congress's 10% racial quota is inflexible; as explained above, only certain racial groups get a presumption of inclusion in the definition of "socially disadvantaged." *See* 13 C.F.R. § 124.103 ("Who is socially disadvantaged?"). The law contains no provisions allowing flexibility, such as allowing the Department of Transportation to terminate the preference early or downward adjust the quota from 10% to 5% or 1%. The quota must be "not less than 10 percent." *See* Infrastructure Act, § 11101(e)(3).

As for duration, race preferences in contracting ought to be a "temporary matter." *Croson*, 488 U.S. at 510. A nearly identical 10% quota existed in 1977 and similar programs have existed for decades. *See Fullilove*, 448 U.S. 448 (abrogated by *Adarand*, 515 U.S. at 235–36). The Infrastructure Law itself at least covers appropriations during fiscal year 2026 (*see* Section 11101(a)(1)(E)), but there is no indication that Congress intends to declare "mission accomplished" at that time.

To be narrowly tailored, a race-based preference must be "limited in time." *Grutter*, 539 U.S. at 342. "[A]ffirmative action selection provisions are themselves a form of discrimination that cannot continue forever." *Ensley Branch*, 31 F.3d at 1571. As the Court said in *Grutter*, "[t]he Court expects that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today." *Id.* at 343. Defendants cannot explain

why a 25-year deadline is somehow permissible for college admissions, while a federal-contractor race quota requires a fourth decade of implementation.

3. For the third factor, courts consider "the relationship of numerical goals to the relevant labor market." Here, there is no "numerical goal," only a mandate of at least 10%. *See* Infrastructure Act, § 11101(e). It is hard to see what such a number's relationship is to the relevant labor market or the relevant contracting market. Defendants must explain the basis of 10%.

4. Finally, and perhaps most importantly, Congress's race-based quota unnecessarily hurts innocent third parties. Plaintiff Bruckner is a small business owner trying to obtain federal contracts and complete those contracts. But, through no fault of his own, Plaintiff Bruckner is not in the preferred class and therefore ineligible to compete for over $37 billion in federal contracts.

For these reasons, the racial categories in the Infrastructure Act are not narrowly tailored and must therefore fail strict scrutiny by this Court.

## II.    Plaintiffs are likely to succeed on gender discrimination claim.

Intermediate scrutiny is the applicable constitutional standard for analyzing programs that establish gender preferences. *Eng'g Contractors*, 122 F.3d at 907–08. Government policies that discriminate based on sex cannot stand unless the government provides an "exceedingly persuasive justification." *U.S. v. Virginia*, 518 U.S. 515, 531 (1996). To meet this burden, the government must prove that (1) a sex-based classification serves

"important governmental objectives," and (2) the classification is "substantially and directly related" to the government's objectives. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 730 (1982) (cleaned up).

Here, the Infrastructure Act only attempts to justify its gender discrimination because of past discrimination against women. But "to have a legitimate interest in remedying sex discrimination, the government first needs proof that discrimination occurred." *Vitolo*, 999 F.3d at 364. The government must show that women "actually suffer[ed] a disadvantage" because of discrimination in a specific industry or field. *Hogan*, 458 U.S. at 728; *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975) ("[T]he mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme."); *see also Craig v. Boren*, 429 U.S. 190, 200–04 (1976) (describing the high bar to using statistics as evidence of discrimination and concluding that "proving broad sociological propositions by statistics is a dubious business"). Pointing to statistical disparities is not enough: "Without proof of intentional discrimination against women, a policy that discriminates on the basis of sex cannot serve a valid governmental objective." *Vitolo*, 999 F.3d at 365. Defendants must make an offer of proof here because the Infrastructure Act's findings provide no proof of intentional discrimination against women in the infrastructure contracting industry.

Additionally, this gender preference must be "substantially related to" the purported remedial objective. *Wiesenfeld*, 420 U.S. at 651–53. Here, the gender preference is granted to *all* women regardless of whether they are "economically disadvantaged." So if the goal is to wipe away the effects of past gender discrimination against women, one would think that the government would only target "economically disadvantaged" women, in the same way it only targets "economically disadvantaged" minorities (or, at least some minorities). In other words, if the goal of the "economically disadvantaged" criterion is to identify actual harm from past discrimination, then the government must justify why it has excluded women from this requirement. For this very reason, the Sixth Circuit found that the gender discrimination in the Restaurant Revitalization Fund was not substantially related to the goal of helping women who suffered under prior government programs. *Vitolo*, 999 F.3d at 365. The same is true here: the gender preference is not substantially related to an important governmental objective.

## III. Infrastructure Act's quotas harm Plaintiffs' dignity, which is irreparable.

When a "deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary." Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d. ed.); *e.g.*, *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984) ("[W]e hold that because

of the subtle, pervasive, and essentially irremediable nature of racial discrimination, proof of the existence of discriminatory housing practices is sufficient to permit a court to presume irreparable injury."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."); *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citation omitted).

As the Supreme Court has recognized, "a racial classification causes 'fundamental injury' to the 'individual rights of a person.'" *Shaw,* 517 U.S. at 908. Indeed, the *primary* injury "in an equal protection case of this variety is the denial of equal treatment" itself. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). Plaintiffs are being treated differently by the government and denied equal access to government contracts based on race and gender. Such unequal treatment "demeans us all." *Grutter*, 539 U.S. at 353 (2003) (Thomas, J., concurring in part and dissenting in part); *see also Vitolo*, 999 F.3d at 365 (collecting cases); *O'Donnell Const. Co.*, 963 F.2d at 428–29; *Small v. Hudson*,

322 F. Supp. 519, 529 n. 37 (M.D. Fla. 1970) ("Racial discrimination is per se irreparable harm to the minority group.").[3]

## IV. The Public Interest and Balance of Harms Favors an Injunction.

The public interest is always served when constitutional rights are vindicated.[4] *See Laube v. Haley*, 234 F. Supp. 2d 1227, 1252 (M.D. Ala. 2002) ("[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated . . . ."); *Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1318-19 (S.D. Fla. 2014); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("The vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition."); *White v. Baker*, 696 F. Supp. 2d 1289, 1313 (N.D. Ga. 2010) (if "a constitutional right is at issue, the entry of an injunction would not be adverse to the public interest but would in fact advance it.").

## CONCLUSION

Plaintiffs respectfully request that the Court grant this motion and enter an injunction in the form of the proposed order attached to this motion.

---

[3] Moreover, damages for constitutional violations are impossible outside of the *Bivens* context, *see Loumiet v. United States*, 828 F.3d 935, 945 (D.C. Cir. 2016), and even if damages were available, calculating such damages would be speculative, which has lead courts to recognize that "the difficulty of such an inherently speculative showing weighs heavily in favor of granting [an] injunction." *E.g., O'Donnell Const. Co.* 963 F.2d at 428.

[4] According to the Eleventh Circuit, "the third and fourth factors 'merge' when, as here, the government is the opposing party." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020) (internal citation and brackets omitted).

Dated: July 26, 2022

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

/s/ *Daniel P. Lennington*

Richard M. Esenberg
Daniel P. Lennington
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Dan@will-law.org

ABEL BEAN LAW P.A.
Daniel K. Bean
Jared J. Burns
100 N. Laura Street, Suite 501
Jacksonville, FL 32202
Telephone: (904) 944-4100
dbean@abelbeanlaw.com
jburns@abelbeanlaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that, on July 26, 2022, I electronically filed a copy of the foregoing document with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all counsel of record.

 /s/ *Daniel P. Lennington*