## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **CHRISTIAN BRUCKNER**, *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>**JOSEPH R. BIDEN, JR.**, *et al.*,<br><br>**Defendants.** | **Case No. 8:22-cv-1582-KKM-SPF** |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The Court should deny Plaintiffs' Amended Motion for Preliminary Injunction, ECF No. 17 (Motion), because Plaintiffs have failed to carry their heavy burden of establishing that they are entitled to the drastic remedy of preliminary injunctive relief. Plaintiffs completely misconstrue the language of the statutory provision they challenge, imagining that it creates a race- and gender-conscious system of quotas and set asides while ignoring long-standing implementing regulations and well-settled case law that establish that it does not. Plaintiffs cannot show an injury in fact to establish standing, much less an irreparable injury that would permit this Court to enjoin a vital nationwide transportation program that has been in effect since 1983 and consistently and repeatedly determined to be constitutional under strict scrutiny analysis in multiple jurisdictions. In response to the Court's Order directing the Parties to "address the scope of any potential preliminary injunction," Defendants submit that

Plaintiffs' requested relief, if deemed appropriate by the Court, should be limited to the two named Plaintiffs.[1]

## BACKGROUND

### I.   Procedural History

On July 13, 2022, Plaintiffs filed suit challenging the U.S. Department of Transportation's (DOT) implementation of § 11101(e)(3) of the Infrastructure Investment and Jobs Act (Infrastructure Act). *See generally* Compl., ECF No. 1. Plaintiff Christian Bruckner alleges that he owns Project Management Corporation, a for-profit corporation and the second Plaintiff in this action, that fulfills transportation and infrastructure-related contracts. *Id.* ¶ 7. Bruckner, who identifies as white and disabled, alleges that he cannot compete on an equal footing for contracts under the Infrastructure Act. *Id.* ¶¶ 25–26. He claims that the Act's goal of awarding 10% of contracts to businesses owned by "socially and economically disadvantaged individuals," which he is not presumed to be, violates equal protection. *Id.* ¶¶ 26, 35–37. On July 29, 2022, Plaintiffs filed an amended motion for preliminary injunction, ECF No. 17 (Motion), to enjoin DOT from implementing § 11103(e)(3).

### II.   Statutory Background

The Infrastructure Investment and Jobs Act was signed into law on November 15, 2021. *See* Pub. L. No. 177-58, 135 Stat. 429 (Nov. 15, 2021).[2] As part of the Act, Congress reauthorized the Disadvantaged Business Enterprise program, known as the

---

[1] *See* Prelim. Inj. Mot. Scheduling Order, ECF No. 22, at 2.
[2] Available here: https://www.congress.gov/bill/117th-congress/house-bill/3684/text.

DOT DBE program, which as in prior reauthorizations directed that "[e]xcept to the extent that the Secretary determines otherwise, not less than 10 percent of the amounts made available for" specified federally-funded highway and transit programs "shall be expended" through DBEs. Pub. L. No. 117-58, § 11101(e), 135 Stat. at 448–50. Contrary to Plaintiffs' suggestion that the Infrastructure Act's 10% aspirational DBE goal is part of a novel government program that involves a "quota," the Act merely reauthorized the DOT's constitutionally sound DBE program with an aspirational goal for economically and socially disadvantaged businesses to participate in our nation's transportation programs. The DOT DBE program is implemented through long-standing DOT regulations found in 49 C.F.R. part 26, under which the Secretary of Transportation has exercised the authority afforded him by Congress to, among other things, prohibit the use of quotas and permit the use of race- and gender-conscious means only if DBE participation goals cannot be met through race- and gender-neutral means. *See infra* Section I.C.2. Earlier versions of the DBE program, including the Minority Business Enterprise and Women Business Enterprise programs, have been in place since 1980. *See* 64 Fed. Reg. 5096, 5096 (1999). In 1983, Congress enacted the first DBE program[3] and has since reauthorized the program for highway and transit projects in surface transportation bills.[4] Congress has not

---

[3] *See* Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f) (1983).
[4] *See* Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. No. 100-17, § 106(c) (1987); Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, § 1003(b)(1) (1991); Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, § 1101(b)(1) (1998); Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-59, § 1101(b)(2) (2005); Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-

materially changed the scope or definition of the DOT DBE program for decades. Most recently, in reauthorizing the DOT DBE program in the Infrastructure Act, Congress found that "while significant progress has occurred due to the establishment of the disadvantaged business enterprise program, discrimination and related barriers continue to pose significant obstacles for minority- and women-owned businesses seeking to do business in Federally assisted surface transportation markets across the United States."[5] Congress then determined that factual findings of the continuing barriers, due to discrimination and its lingering effects, served as a factual predicate for "the continuation of the disadvantaged business enterprise program."[6]

More than seven months later, Plaintiffs filed this complaint challenging the constitutionality of the DOT DBE program and filed a motion for a preliminary injunction due to the alleged "irreparable injury of a constitutional violation." Plaintiffs are not the first to challenge the constitutionality of the DOT DBE program. Over the last three decades, multiple equal protection challenges, both facial and as-applied, have been filed alleging the program's authorizing statutes and implementing regulations did not pass constitutional muster.[7] Each challenge has failed.

---

141, § 1101(b)(3) (2012); Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 1101(b)(3) (2015).

[5] Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58, § 11101(e)(1)(A) (2021).

[6] *Id.* § 11101(e)(1)(B).

[7] *See infra* Section I.C.1 (discussing *Midwest Fence Corp. v. Dep't of Transp.*, 840 F.3d 932, 941, 935–36 (7th Cir. 2016); *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 995 (9th Cir. 2005); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 967–68 (8th Cir. 2003); *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1155 (10th Cir. 2000)); *see also Geyer Signal, Inc. v. Minn. Dep't of Transp.*, Civ. No. 11-321, 2014 WL 1309092, at *12–17 (D. Minn. Mar. 31, 2014); *N. Contracting Inc. v. Illinois*, No. 00-C-4515, 2004 WL 422704, at *25–40 (N.D. Ill. Mar. 3, 2004); *cf. Cache Valley*

## LEGAL STANDARD

A preliminary injunction is a "drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion on all four elements." *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001).[8] Namely, the movant must show that "(1) [he] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020). The latter two factors "merge when, as here, the Government is the opposing party." *Id.* at 1293. "To carry its burden," the movant "must offer proof beyond unverified allegations in the pleadings"; "vague or conclusory affidavits" will not suffice. *Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001). "The burden of persuasion in all of the four requirements is at all times upon the plaintiff." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Accordingly, "[f]ailure to show any of the four factors is fatal." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

---

*Elec. Co. v. Utah Dep't of Transp.*, 149 F.3d 1119, 1123 (10th Cir. 1998) (rejecting equal protection challenge on standing grounds); *Klaver Const. Co. v. Kan. Dep't of Transp.*, 211 F. Supp. 2d 1296, 1308 (D. Kan. 2002); *Interstate Traffic Control v. Beverage*, 101 F. Supp. 2d 445, 453 (S.D. W. Va. 2000).
[8] All internal alterations, citations, omissions, quotations, and subsequent history are omitted unless otherwise indicated.

## ARGUMENT

Plaintiffs have not carried their burden with respect to any of the elements necessary for obtaining preliminary injunctive relief, and the Court should deny their motion in its entirety. But even if the Court determines that preliminary injunctive relief is appropriate, the Court should limit its scope to the two named Plaintiffs.

**I.      Plaintiffs Cannot Show that They Are Likely to Succeed on Their Facial Challenge to the Infrastructure Act.**

Plaintiffs cannot demonstrate a likelihood of success on the merits of their claims because they have not suffered any injury in fact. Moreover, this case is not justiciable because Plaintiffs' claims are unripe. Even if Plaintiffs had standing and their claims were ripe, they are unlikely to succeed on the merits of their claims because the DOT DBE program is—as every other court has found—narrowly tailored to serve a compelling governmental interest and thus passes constitutional muster.

**A.      Plaintiffs Have Not Suffered an Injury in Fact.**

To establish an injury in fact, a plaintiff must plead (and later support) that "it suffered 'an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1271 (11th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). The Supreme Court has explained the "imminence" requirement of injury in fact as follows:

> Although imminence is concededly a somewhat elastic concept, it cannot
> be stretched beyond its purpose, which is to ensure that the alleged injury
> is not too speculative for Article III purposes—that the injury is *certainly*
> impending. . . . Thus, we have repeatedly reiterated that 'threatened

injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient.

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphases in original); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) ("The plaintiff must show that he . . . is immediately in danger of sustaining some direct injury[.]").

Plaintiffs contend that a violation of constitutional rights immediately constitutes irreparable harm. *See* Mot. at 23–24. That is not the law in this Circuit. *See, e.g.*, *Siegel v. Lepore*, 234 F.3d 1163, 1177–78 (11th Cir. 2000); *see also N.E. Fla.*, 896 F.2d at 1285 ("No authority from the Supreme Court or the Eleventh Circuit has been cited to us for the proposition that the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation."); *Cunningham v. Adams*, 808 F.2d 815, 821–22 (11th Cir.1987) (affirming denial of preliminary injunction in action alleging Fourteenth Amendment violations due to district court's rejection of the plaintiff's argument that "irreparable injury will be presumed where there has been a violation of substantive constitutional rights").

Here, the basis for the preliminary injunctive relief Plaintiffs seek suffers from the same infirmities that the Eleventh Circuit rejected in *Siegel* and related cases. Plaintiffs allege that they "cannot compete equally for all contracts available under the Infrastructure Act, specifically $37 billion in set asides for women and certain racial groups." Compl. ¶ 26; *see* Mot. at 24 ("Plaintiffs are being treated differently by the government and denied equal access to government contracts based on race and gender."). Plaintiffs further allege that they "suffer ongoing harm to their dignity

7

because of the Infrastructure Act's unlawful race and gender discrimination." Compl. ¶ 26; *see* Mot. at 24 (asserting that "[s]uch unequal treatment demeans" Plaintiffs). But Plaintiffs' theory of standing "relies on a highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).

Plaintiffs have not even alleged they submitted a bid to any DOT fund recipient, much less what the DOT DBE goals on that recipient's project were, or that they have *ever* contracted with a DOT fund recipient in the past. *See generally* Compl. Plaintiffs' alleged harms could only be realized if a series of highly speculative events all occurred in sequence: (1) Plaintiffs submit a bid as a subcontractor to a prime contractor that has bid for a state or local project that has received funding under the Infrastructure Act; (2) that project has identifiable race- or gender-conscious goals that cannot be met through race-or gender-neutral methodologies; (3) the state or local agency accepts a different bid with DBE subcontractors in order to meet its locally set DBE goal, *see* Ex. 4, McCallum Decl. ¶ 11; Ex. 5, Kenley Decl. ¶ 12 (both citing 49 C.F.R. § 26.51(a)); and (4) Plaintiffs exhaust their administrative remedies and lose any appeals. To date, not even *one* of these speculative events has occurred, and Plaintiffs offer no evidence suggesting this status quo will change.

Thus, Plaintiffs' alleged injuries rely on speculation atop speculation. They have not identified a single state or local transportation contract funded under the Infrastructure Act: (1) to which they have submitted or plan to submit a bid; (2) has race- or gender-conscious-goals; or (3) is in a jurisdiction where the race- or gender-

8

conscious goals cannot be met through race- or gender-neutral means. They confront precisely the kind of "highly attenuated chain of possibilities" that is insufficient to establish injury in fact. *Clapper*, 568 U.S. at 410. The Infrastructure Act "at most *authorizes*—but does not *mandate* or *direct*"—the use of preferences for economically disadvantaged individuals that Plaintiffs fear. *Id.* at 412 (emphases in original). In sum, Plaintiffs have failed to show that their asserted vague injuries are "imminent," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), or "certainly impending," *Clapper*, 568 U.S. at 409, and therefore they cannot show an injury in fact.

### B.   Plaintiffs' Claims Are Unripe for Review.

Even if the Court determines that Plaintiffs have suffered an injury in fact sufficient to bring an equal protection claim, the claim is not ripe for this Court's review. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–581 (1985)). The ripeness inquiry requires the Court "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 300–01 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). In evaluating "fitness" and "hardship," the Eleventh Circuit considers: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues

presented." *Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001) (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

Here, all factors weigh against review of Plaintiffs' equal protection claim. First, delayed review would not cause any hardship to Plaintiffs because they have not alleged that they have submitted a bid for a contract that receives funding under the Infrastructure Act—much less been denied a contract in favor of a prime contractor with DBE subcontractors. On the other hand, judicial intervention would unquestionably interfere with further administrative action by the DOT. Ex. 4, McCallum Decl. ¶¶ 6–7; Ex. 5, Kenley Decl. ¶¶ 7–8. Roads and transit projects are being funded. Contract bids are being submitted to state and local DOT fund recipients. *Id.* Road and transit projects are being built. *Id.* Even if the Court limits the scope of preliminary injunctive relief to the named Plaintiffs, such an injunction would substantially disrupt the administration and allocation of what Plaintiffs themselves describe as "$370 billion in new spending for roads, bridges, and other surface transportation projects," Compl. ¶ 1, by requiring multiple government agencies to, among other things, implement and observe court-ordered exceptions for any bids that Plaintiffs submit in any state. Ex. 4, McCallum Decl. ¶ 8. This is an unprecedented administrative burden that the Court should only impose under the most extraordinary circumstances, which are not present here. Finally, the Court would benefit from further factual development of the issues presented by Plaintiffs, including the identification of the recipient or prime contractor to whom Plaintiffs submit a bid, if they do so, and the nature of the project and race- and gender-conscious goals, if any,

applicable in that project, should it determine that Plaintiffs are not selected to work on the project. But as the Eleventh Circuit has noted, cases are less likely to satisfy the element of fitness for adjudication "when they require 'speculation about contingent future events.'" *Pittman*, 267 F.3d at 1278 (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995)). Because Plaintiffs' equal protection claim is not ripe for this Court's review, the Court should deny their motion for a preliminary injunction.

### C. Plaintiffs Cannot Show that They Are Likely to Succeed on Their Facial Challenge to the Infrastructure Act.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987 ). That burden is particularly heavy where, as here, the facial challenge is to a statute authorizing a program that courts have repeatedly and uniformly deemed constitutional under equal protection analysis. Indeed, four circuits have upheld the same DOT DBE program that Plaintiffs challenge here, in each instance finding that it was constitutional because it served a compelling governmental interest and was narrowly tailored to advance that interest.

"The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 237 (1995). Thus, "[a]lthough all governmental uses of race are subject to strict scrutiny, not all are invalidated by it." *Grutter v. Bollinger*, 539 U.S. 306,

326–27 (2003). "When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." *Id.* at 327. For race-conscious programs, once the government shows that it had "a strong basis in evidence for its conclusion that remedial action was necessary," the plaintiff bears "[t]he ultimate burden . . . to demonstrate the unconstitutionality of an affirmative-action program." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277–78 (1986). Under the intermediate scrutiny standard for sex-conscious government actions, the government must show that classification serves "important governmental objectives," and is "substantially and directly related" to the government's objectives. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 730 (1982).

### 1. *Every Court of Appeals to Consider the DOT DBE Program Has Upheld It.*

The Seventh, Eighth, Ninth, and Tenth Circuits have considered similar equal protection challenges to the DOT DBE program, and in each case those courts found the program was constitutional on its face, met strict scrutiny, and was supported by a compelling interest and narrowly tailored to advance that interest. *See Midwest Fence Corp. v. Dep't of Transp.*, 840 F.3d 932, 941, 935–36 (7th Cir. 2016); *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 995 (9th Cir. 2005); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 967–68 (8th Cir. 2003); *Adarand Constructors, Inc.*

12

*v. Slater*, 228 F.3d 1147, 1155 (10th Cir. 2000).[9] Unable to distinguish this seminal authority—indeed, for the most part, they fail to even cite it—Plaintiffs are unlikely to succeed on their challenge to the reauthorized DOT DBE program.

First, in *Midwest Fence*, 840 F.3d 932, the plaintiff, a fencing and guardrail contractor, filed a complaint against DOT, the Illinois Department of Transportation (IDOT), and the Illinois State Tollway Highway Authority (Tollway) challenging the constitutionality of the DOT DBE program, the application of the program by IDOT, and the Tollway's analogous DBE program. In affirming the district court's ruling upholding the constitutionality of the federal, IDOT, and Tollway programs, the Seventh Circuit concluded that the federal DOT DBE program was narrowly tailored and thus constitutional on its face. *Id.* at 935–36, 942. Based on a review of studies presenting statistical evidence of disparities between the availability and utilization of DBEs in the relevant market areas, the court found that both IDOT and the Tollway had a strong basis in evidence to adopt their programs. *Id.* at 949–51; *see also infra* Section I.C.2. The court also concluded that all three programs were narrowly tailored because they used race- and gender-neutral alternatives and included waivers from provisions that require specific goals when a contractor has made good faith efforts to comply with a DBE goal. *Id.* at 942–43, 954.

In *Western States Paving Co.*, 407 F.3d 983, the plaintiff, an asphalt and paving

---

[9] Based on the plethora of case law upholding on constitutional grounds previous iterations of the exact same federal government program Plaintiffs are challenging, Plaintiffs' claim that they "are unaware of any court that has upheld such a broad, race-based program," strains credulity. *See* Mot. at 7.

contractor owned by a white male, lost two subcontracting bids even though its bid was lower than that of a minority-owned firm that ultimately won the subcontract. In upholding the program, the Ninth Circuit found that, based on statistical and anecdotal evidence, "[t]he federal government has a compelling interest in ensuring that its funding is not distributed in a manner that perpetuates the effects of either public or private discrimination within the transportation contracting industry." *Id.* at 991. The court also found that the federal government's DBE program was narrowly tailored because the "regulations place a preference on the use of race-neutral means," "explicitly prohibit the use of quotas," and contain adequate durational limits. *Id.* at 993–94. Furthermore, the court reasoned that the regulations "provide for each State [recipient] to establish a DBE utilization goal that is based upon the proportion of ready, willing, and able DBEs in the State's transportation contracting industry [which] ensures that each State sets a minority utilization goal that reflects the realities of its own labor market." *Id.* at 995 (citing *Sherbrooke Turf, Inc.*, 345 F.3d at 972 ("DOT has tied the goals for DBE participation to the relevant labor markets.")). Ultimately, the court held that the federal "DBE program is a narrowly tailored means of remedying the effects of race-and sex-based discrimination within the transportation contracting industry." *Id.*

In *Sherbrooke Turf, Inc.*, 345 F.3d 964, the plaintiffs, both nonminority landscaping contractors whose bids for highway landscaping projects were rejected in favor of competing DBE contractors, filed suit alleging the DOT DBE program violated the Equal Protection Clause. The Eighth Circuit upheld the district court's

findings that the program served a compelling government and that the federal government provided sufficient evidence showing that race-based measures were necessary to eradicate the effects of discrimination in the transportation sector. *Id.* at 969–70. The court held the DOT DBE regulations were narrowly tailored because (1) the "regulations place strong emphasis on 'the use of race-neutral means to increase minority business participation in government contracting' . . . [and] prohibit the use of quotas and severely limit the use of set-asides"; (2) "the revised DBE program has substantial flexibility"; (3) "DOT has tied the goals for DBE participation to the relevant labor markets"; and (4) "Congress and DOT have taken significant steps to minimize the race-based nature of the DBE program." *Id.* at 970–73.

In *Slater*, 228 F.3d 1147, a nonminority subcontractor who lost bids to a DBE subcontractor brought suit arguing that the DBE program was unconstitutional. After noting that "[t]he remediation of nation-wide problems . . . is particularly within the purview of Congress, and findings of industry-wide discrimination are precisely what is relevant to a federal decision to undertake remedial action," the Tenth Circuit ultimately held that the DBE program was constitutional on its face because the federal government has a "compelling interest in not perpetuating the effects of racial discrimination in its own distribution of federal funds and in remediating the effects of past discrimination" in government contracting. *Id.* at 1163 n.8, 1165; *see also id.* at 1176 n.18 (noting that "evidence of specific barriers to market entry and fair competition facing actual and potential minority participants in the market for public construction contracts" can provide a strong basis).

15

Applying this well-settled authority upholding the exact same federal program authorized by the exact same statutory language at issue here, the Court should find that Plaintiffs have failed to carry their burden of establishing that they are likely to succeed on their constitutional claim. As in each of the above cases, the DOT DBE program that they challenge, as reauthorized by the Infrastructure Act, serves a compelling governmental interest and is narrowly tailored to advance that interest.

### 2. The Government Has a Strong Basis in Evidence to Conclude that Remedial Action Is Necessary to Further Its Compelling Interests.

The government must have "a strong basis in evidence for its conclusion that such action was necessary" to further its compelling interests, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989), which it may establish through persuasive statistical data and anecdotal evidence. *Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cty.*, 122 F.3d 895, 907 (11th Cir. 1997).[10] In cases applying strict scrutiny, the Eleventh Circuit has instructed that "remedying past or present discrimination" is widely accepted as a compelling governmental interest, and thus the constitutional analysis hinges on "the adequacy of the evidence of discrimination offered to show that interest." *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1564 (11th Cir. 1994) (citations omitted). In *Engineering Contractors Association of South Florida, Inc.*, the Eleventh Circuit summarized the types of evidence appropriate in this analysis and found that an "amorphous claim of societal discrimination" would not stand scrutiny,

---

[10] Because Defendants can establish that the DOT DBE program meets the higher standard of constitutional scrutiny for race-based programs, as opposed to intermediate scrutiny for gender-based programs, Defendants will focus on that level of constitutional analysis in this response.

16

but courts could rely on "statistical disparities between the proportion of minorities hired and the proportion of minorities willing and able to do the work." 122 F.3d 895, 906–07 (11th Cir. 1997). "Anecdotal evidence may also be used to document discrimination, especially if buttressed by relevant statistical evidence." *Id.* (internal quotations and citations omitted). Also, because the government "need not have produced such evidence before adopting the remedy . . . the Government is not precluded from presenting post enactment evidence to establish a compelling governmental interest in this case." *Id.*[11]

In this context, "[w]here there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise." *Croson*, 488 U.S. at 509; *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another.").

This exact type of evidence demonstrating the persistence of discrimination and its lingering effects is evident in the transportation construction industry and supports

---

[11] However, formal findings by a government entity "need neither precede nor accompany the adoption of affirmative action." *Ensley Branch*, 31 F.3d at 1565; *see also Wygant*, 476 U.S. at 286 (rejecting any formal findings requirement). In *Ensley Branch*, the Eleventh Circuit allowed the government to justify its affirmative action plans post-hoc using any evidence available to it. *See id.* at 1568 ("If the City and Board can now show strong evidence of the need for affirmative action in a department, then future affirmative action in that department is justified.").

the constitutionality of the Infrastructure Act. Since 2010, over 200 disparity studies, other reports and studies, and congressional testimony, document discrimination and its lingering effects that continues to affect the ability of DBEs to compete equally for government contracts. *See* Ex. 1, *The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence* (Jan. 2022) ("Compelling Interest Report").[12] The Compelling Interest Report compiles and summarizes recent evidence of discriminatory barriers that impede participation by racial minorities in government contracting. *Id*. at 19–27.

Of particular consequence are the hundreds of disparity studies that were submitted to Congress in advance of the reauthorization of the DOT DBE program.[13] Disparity studies include both qualitative and quantitative evidence demonstrating the effects of discrimination in state and local marketplaces. In 2020, the House Committee on Transportation and Infrastructure "amassed an enormous amount of evidence providing an exceedingly strong basis for the conclusion that discrimination against minority- and women-owned businesses continues to affect the construction, architecture and engineering, and related surface transportation contracting markets nationwide."[14] In June 2021, Congress received over 100 disparity studies published

---

[12] The Compelling Interest Report has been considered by Congress. *See* 158 Cong. Rec. E619-20 (statement of Rep. Carolyn Maloney). The 2022 report updated and expanded upon a 2010 DOJ Report on the same topic, which also was considered by Congress and cited in federal court as evidence of a compelling government interest in the use of race-conscious measures to support the ability of people of color to compete on an equal basis. *See Midwest Fence Corp. v. United States Dep't of Transp.*, No. 10 C 5627, 2011 WL 2551179, at *12 (N.D. Ill. June 27, 2011).

[13] Defendants can, at the Court's request, provide copies of any of the referenced studies.

[14] H.R. Rep. No. 116-437, at 331 (2020).

from 2015 to 2021 as evidence of discrimination and its lingering effect based on both race and gender in support of the reauthorization of the DOT DBE program.[15] In June 2021, Congress made specific findings as to the value of such studies: "[D]isparity studies contain myriad analyses aimed at answering the question: 'Does business discrimination based on race or gender continue to exist?' Even a cursory review of the studies reveals that the answer is resoundingly 'yes.'"[16] Congress also specifically reviewed many of these studies analyzing the disparities between the availability and utilization of DBEs by state and local government agencies.[17]

Moreover, recently in *Ultima Services Corporation v. U.S. Department of Agriculture,* Case No. 2:20-cv-00041-DCLC-CRW (E.D. Tenn. June 21, 2022), ECF No. 61, Ex. 11 ("Wainwright Report"), the government submitted an expert report by Dr. Jon Wainwright that analyzed the disparity studies considered by Congress and others (over 200 in total) and other statistical evidence that shows that DBEs face significant disparities in public and private contracting markets, and, based on qualitative and statistical analysis, he concluded that these disparities are consistent with discrimination. Ex. 2, Wainwright Report, at 7–8, 81. Disparity studies consist of much more than simply the "broad statistical disparities" that the Sixth Circuit found were "not nearly enough" to show discrimination on the limited record available in

---

[15] 167 Cong. Rec. H3505-07 (daily ed. June 30, 2021) (statement of Rep. DeFazio) (listing disparity studies); 167 Cong. Rec. S5898-99 (daily ed. August 5, 2021) (statement of Sen. Tom Carper) (same).
[16] H.R. Rep. No. 117-70, at 392–95 (2021).
[17] 167 Cong. Rec. S5898 (2021). The House Committee on Transportation and Infrastructure reviewed these studies, many of which found that disparities between DBEs and non-minority male businesses are "far greater than the disparities that persist in the public sector where remedial programs are more routine." H.R. Rep. 117-70, at 393 (2021).

*Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021). They include additional evidence and statistical methods that tie the disparities to discrimination, including regression analyses, statistical significance—which eliminates the possibility that the disparities could be due to random chance—and surveys, interviews, and other qualitative evidence that documents the personal accounts of business owners and identifies the discriminatory barriers that contribute to much of the disparities. *See* Ex. 2, Wainwright Report, at 17–19. Given the rich body of quantitative and qualitative evidence they provide, it is unsurprising that courts consistently find that disparity studies provide persuasive evidence of discrimination and its continuing effects. *See, e.g.*, *Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1196 (9th Cir. 2013); *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 257 (4th Cir. 2010); *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1174 (10th Cir. 2000); *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 84 F. Supp. 3d 705, 727 (N.D. Ill. 2015); *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 107 F. Supp. 3d 183, 209–10 (D.D.C. 2015).

Second, Defendants' other expert in *Ultima*, economist Daniel Chow, identified substantial disparities in direct federal government contracting and conducted a regression analysis that eliminated potentially non-discriminatory reasons for the disparities. *Ultima,* ECF No. 61-13 (June 21, 2022); *see* Ex. 3 ("Chow Report"). Using federal contracting data from April 2019 to August 2020, Chow utilized regression analyses to determine that small disadvantaged businesses (SDBs) were much less likely to win federal contracts relative to non-SDBs with similar size, age, receipts and other characteristics. Ex. 3, Chow Report, at 2.

The statistical evidence demonstrated by disparity studies and expert reports is bolstered by qualitative evidence that shows the various ways discrimination hinders the ability of minority- and women-owned businesses to compete equitably for government contracts and the federal government's passive participation in that discrimination. While discrimination can take many forms, three primary obstacles are: (1) discrimination by procurement agencies and prime contractors, (2) exclusion from business networks, and (3) discrimination by bonding companies and suppliers. *See* Ex. 1, Compelling Interest Report, at 19–34. All of these discriminatory elements combine to create a marketplace that poses additional burdens preventing DBEs from competing on an equal playing field for government contracts. *Id.*

### 3.  *The DBE Program Is Narrowly Tailored.*

To determine whether race-conscious remedies are narrowly tailored, courts analyze the following factors: (a) the necessity for relief and the efficacy of alternative remedies; (b) the flexibility and duration of the relief, including waiver provisions; (c) the relationship of numerical goals to the relevant labor market; (d) the impact of the relief on third parties; and (e) the under- or over-inclusiveness of the program. *United States v. Paradise*, 480 U.S. 149, 171 (1987); *see Croson*, 488 U.S. at 507. In sum, the Supreme Court has found that while "narrow tailoring does not require exhaustion of every conceivable race-neutral alternative, it does require serious, good faith consideration of workable race-neutral alternatives." *W. States Paving Co.*, 407 F.3d at 993 (quoting *Bollinger*, 539 U.S. at 339). Using these factors, every court that has analyzed the DOT DBE program and its implementing regulations has found it

narrowly tailored. *See Sherbrooke Turf,* 345 F.3d at 972; *see also W. States Paving Co.*, 407 F.3d at 1002–03.[18]

First, Plaintiffs' allegation that the groups presumed to be economically and socially disadvantaged under the DOT DBE program are somehow simultaneously both under- and over-inclusive is not grounds to diverge from these consistent findings of narrow tailoring. *See* Mot. at 16–19. The presumptions are subject to challenge. For example, the presumption of economic disadvantage for both minority and female applicants may be rebutted in two ways: if the business owner has a personal net worth in excess of $1.32 million or is able to accumulate substantial wealth. 49 C.F.R. § 26.67(b).[19] The presumption of social disadvantage may be overcome by a preponderance of the evidence that the individual, despite being a member of the designated group, is not socially disadvantaged. *Id.* § 26.67(b)(3). If not presumed disadvantaged by the DOT, a male businessowner of any race, such as Plaintiff Bruckner should he satisfy the economic qualifications of the statute, may qualify as a DBE by meeting certain conditions and demonstrating social and economic disadvantage. *See* 49 C.F.R. § 26.67(d) & app. E. Here, however, there is no evidence that Plaintiff has ever applied to be in the program.

Moreover, the Infrastructure Act is substantially different from the program

---

[18] Plaintiffs do not cite or even mention DOT's DBE program regulations in their Complaint or their Motion.
[19] The text of this regulation thus belies Plaintiffs' assertion that "the gender preference is granted to *all* women regardless of whether they are 'economically disadvantaged.'" Mot. at 22; *see* 49 C.F.R. § 26.67(b); *Slater*, 228 F.3d at 1191.

administered under the American Rescue Plan Act in *Vitolo* as cited by Plaintiffs. *See* Mot. at 2–3. The program challenged in *Vitolo* was a limited fund subject to exhaustion, and in practice, could be depleted before qualified applicants could apply. *See Vitolo*, 999 F.3d at 359 (noting that "[r]ace and sex preferences [would] continue to bear on whether an applicant receives a grant before the money runs out"). In contrast, under the Infrastructure Act, Congress has authorized the Federal Highway Administration (FHWA) and the Federal Transit Administration (FTA)—operating administrations within DOT—to distribute appropriated funds over the next five years *to state and local administrative agencies* for the construction, maintenance, and operations of our nation's highways and public transit systems. *See, e.g.*, 23 U.S.C. § 104 (FHWA); 49 U.S.C. § 5338 (FTA); *see also* Ex. 4, McCallum Decl. ¶¶ 3–8; Ex. 5, Kenley Decl. ¶¶ 3–9. Recipients of these funds must develop projects in compliance with applicable federal requirements. One such requirement, applicable to specific programs designated by statute, is compliance with the DOT's DBE program regulations under 49 C.F.R. part 26. *See* Ex. 4, McCallum Decl. ¶ 9; Ex. 5, Kenley Decl. ¶ 10.

DOT's DBE regulations implement the DBE authorizing statute by establishing a national aspirational goal of spending not less than 10% of funds authorized for highway and public transit programs in contracting with DBEs. 49 C.F.R. § 26.41. That goal is not a quota. *Id*. §§ 26.41 & 26.43; *see, e.g.*, *W. States Paving Co.*, 407 F.3d at 994–95. While the overall aspirational goal set by Congress is, and has been since the program's inception, 10%, DOT's DBE regulations neither establish nor allow a

23

single nationwide DBE contracting regime for federally-funded contracts, nor do they establish any penalties for failing to meet the 10% aspirational goal. 49 C.F.R. § 26.41. Instead, they require recipients of DOT funds to have a DBE program of their own with each recipient establishing its own annual goal for DBE participation in federally-funded projects based on local market conditions and upcoming projects in its location. *Id.* §§ 26.21 & 26.45; Ex. 4, McCallum Decl. ¶ 9; Ex. 5, Kenley Decl. ¶ 10.[20] Those goals may be higher or lower than 10%, and there is no requirement that a fund recipient take additional or special actions if its goal is not 10%. 49 C.F.R. § 26.41(c). Further, those recipients must always attempt to meet the goal by using race- and gender-neutral means to the maximum extent possible. *Id.* § 26.51(a). The use of quotas for DBEs is expressly prohibited, and contracts cannot be set aside for DBEs except "in limited and extreme circumstances . . . when no other method could be reasonably expected to redress egregious instances of discrimination." *Id.* § 26.43. If a fund recipient cannot meet its goal solely through neutral means, it may use race-conscious measures and set contract goals only for those contracts with subcontracting possibilities. *Id.* § 26.51(d)–(e); Ex. 4, McCallum Decl. ¶ 11. Moreover, recipients who have administered their program in good faith cannot be penalized or treated as being in noncompliance for falling short of the established DBE goal. 49 C.F.R. § 26.47(a). The State of Florida, for example, has set a goal of DBE participation in federally-

---

[20] No state or local agency is included as a Defendant in this matter, nor is there any evidence Plaintiff Bruckner has ever contracted with a state or local recipient of DOT funds, or has submitted a bid to a state or local agency with a non-race-neutral DOT DBE goal.

funded highway projects at 10.65% for federal fiscal years 2021–23 to be met only through the use of race-neutral means. Ex. 5, Kenley Decl. ¶ 13.[21]

For all of these reasons, it is unlikely that Plaintiffs will be able to demonstrate that the DOT DBE program is not narrowly tailored to meet the compelling interest of remedying the effects of discrimination and its lingering effects in the transportation construction industry.

## II.    Plaintiffs Cannot Show Irreparable Harm.

While Plaintiffs' minimal chance of success on the merits is sufficient basis for the Court to deny Plaintiffs' motion, Plaintiffs also cannot show irreparable harm. "A showing of irreparable harm is the *sine qua non* of injunctive relief." *Ne. Fla.*, 896 F.2d at 1285. Even where a plaintiff can establish a substantial likelihood of success on the merits—and Plaintiffs cannot here—injunctive relief is inappropriate without showing irreparable harm. *See Snook v. Tr. Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 486 (11th Cir. 1990). "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "An injury is 'irreparable' only if it cannot be undone through monetary remedies. . . . Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Ne. Fla.*, 896 F.2d at

---

[21] For FTA-funded projects, 31 recipients in the state of Florida have set goals for DBE participation. The goal for DBE participation varies for each recipient, depending on the projects and geographic area of that recipient. Goals range from 0.22% to 24.3%. Nine recipients in the state use race- and gender-conscious means to support meeting their goal. Twenty-two use only race-neutral means. *See* Ex. 5, Kenley Decl. ¶ 13.

1285 (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). Thus, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* Significantly, "conclusory allegations of irreparable harm or speculative assertions of economic injury," without more, cannot "warrant the extraordinary relief of a preliminary injunction." *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1288 (M.D. Fla. 2021). Moreover, "a delay in seeking a preliminary injunction of even only a few months— though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). As Plaintiffs acknowledge, President Biden signed the Infrastructure Act into law on November 15, 2021, *see* Compl. ¶ 1, but they did not file their initial motion for a preliminary injunction until July 26, 2022.

Here, Plaintiffs' vague allegations of irreparable harm to their dignity are both conclusory and speculative.[22] Plaintiffs' unsupported allegation of an injury to their

---

[22] The speculative nature of Plaintiffs' injury, which is not certainly impending, forecloses them from asserting that it is irreparable, and the cases that Plaintiffs cite in support of this assertion are both inapposite and distinguishable. In *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984), the Eleventh Circuit affirmed the district court's entry of a preliminary injunction against developers and managers of an apartment complex that had demonstrably violated fair housing statutes. In *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012), the Sixth Circuit affirmed the district court's entry of a preliminary injunction against enforcement of a state law preventing some Ohio voters from casting in-person early ballots because the denial of the right to vote "is not fully compensable by monetary damages." *Id.* Plaintiffs' purported injury, on the other hand, is entirely monetary. *See, e.g.*, Compl. ¶ 15 ("The value of this quota is approximately $37 billion."). In *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), the D.C. Circuit concluded that the apparent unconstitutionality of a police checkpoint policy was an "irreparable injury, particularly in light of their strong likelihood of success on the merits." *Id.* Here, however, Plaintiffs have failed to show that the Infrastructure Act is facially unconstitutional and do not have a strong likelihood of success on the merits. *See supra* Section I.C.

dignity is insufficient to carry their burden to establish irreparable harm. "Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support . . . a motion for a preliminary injunction." *Dragon Jade Int'l, Ltd. v. Ultroid, LLC*, 2018 WL 1833160, at *3 (M.D. Fla. Jan. 30, 2018) (quoting Charles Alan Wright, et al., 11A Fed. Practice and Proc. § 2949 (3d ed. 2017)). Plaintiffs present no such evidence. *See GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 38 F. Supp. 3d 1365, 1379 (N.D. Ga. 2014) ("It is the showing of a likely deprivation, not merely the allegation of [it], that amounts to irreparable harm.") (citing *Siegel*, 234 F.3d at 1176). Plaintiffs have not even alleged that they have applied to a DOT fund recipient for certification as a DBE or that they could satisfy the economic disadvantage elements if they applied. And although Plaintiffs assert that "the primary injury 'in an equal protection case of this variety is the denial of equal treatment' itself," Mot. at 23–24 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993)), this injury, which is conjectural and hypothetical, is not irreparable. *See Ne. Fla.*, 896 F.2d at 1285 ("No authority from the Supreme Court or the Eleventh Circuit has been cited to us for the proposition that the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation."). Similarly, Plaintiffs also have not shown that any alleged harm to their dignity that they might suffer would be "imminent." *Siegel*, 234 F.3d at 1176. Thus, because Plaintiffs' alleged harm to their dignity is not an irreparable injury, the Court should deny their motion for a preliminary injunction for this reason alone.

27

**III.    The Injunction Plaintiffs Seek Is Contrary to the Public Interest.**

Finally, the balance of the harms overwhelmingly favors Defendants, as the injunction Plaintiffs seek is manifestly contrary to the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (pointing out that "[t]hese factors merge when the Government is the opposing party"); Mot. at 1 (seeking to prevent Defendants "from implementing the race and gender quota in Section 11101(e)(3) of the Infrastructure Investment and Jobs Act"). Congress passed § 11101(e)(3) based on its determination that minority- and female-owned businesses have faced greater barriers to competing and winning federally-funded transportation contracts, and to ensure that DBEs can compete on a level playing field with non-disadvantaged businesses for such contracts. *See supra* Section I.C.2. And it did so based on evidence that while the DBE program has increased the participation of disadvantaged businesses in DOT-assisted contracts, disparities between the availability and utilization of DBEs by state and local government agencies still remain. *See id.*

As noted, Congress has a compelling interest in remedying prior discrimination and in ensuring that its funds are not allocated in a manner that perpetuates that discrimination. Minority and female business owners have a strong interest in having more access to knowledge and greater opportunities to compete for those funds. And the government and the public have a strong interest in the implementation of the laws enacted by the duly elected representatives in Congress. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable

28

injury."). All of those interests would be harmed if Plaintiffs were to obtain the preliminary relief they seek.

Plaintiffs, on the other hand, are acting in their individual economic interest. They have not shown that their interests will be irreparably harmed by a program that encourages participation of disadvantaged businesses in competing for DOT-assisted contracts. And even if Plaintiffs had made that showing, the government and the public's interests in remedying prior discrimination, ensuring the equitable participation of all businesses competing for projects using federal funds, and implementing duly enacted federal law easily outweigh any individual competitive disadvantage Plaintiffs could possibly suffer as a result of the implementation of § 11101(e)(3).

## IV. Any Injunctive Relief Should Be Limited to the Named Plaintiffs.

Even if the Court determines that preliminary injunctive relief is appropriate, it should limit that relief to the two named Plaintiffs and not bind Defendants as to parties not before the Court.[23] "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). Thus, the "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934. Moreover, principles of equity independently require that injunctions be no broader than "necessary to provide complete relief to

---

[23] Defendants brief this question in response to the Court's Order directing the Parties to "address the scope of any potential preliminary injunction against" the Infrastructure Act and "whether potential injunctive relief should bind Defendants as to parties not before the Court or only the two named Plaintiffs." Prelim. Inj. Mot. Scheduling Order, ECF No. 22, at 2.

the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Any additional relief would be "inconsistent with the rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And it would extend to parties who were not "plaintiff[s] in th[e] lawsuit, and hence were not the proper object of th[e Court's] remediation. *Lewis v. Casey*, 518 U.S. 343, 358 (1996); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (explaining that nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch") (Thomas, J., concurring); *Georgia v. Biden*, __ F. 4th __, 2022 WL 3703822, at *13 (11th Cir. Aug. 26, 2022) (narrowing scope of injunction in multistate challenge to federal contractor vaccine mandate, noting that "nationwide injunctions push against the boundaries of judicial power, and very often impede the proper functioning of our federal court system"). Because Plaintiffs have brought this lawsuit only on their own behalf and on the basis of their alleged injuries alone, *see generally* Compl., the Court should, if it determines relief is appropriate, limit any preliminary injunctive relief to the named Plaintiffs.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: August 29, 2022                          Respectfully submitted,


                                                KRISTEN CLARKE
                                                Assistant Attorney General
                                                Civil Rights Division

                                                KAREN D. WOODARD
                                                Chief
                                                Employment Litigation Section
                                                Civil Rights Division

                                                /s/ Robert Rich
                                                ANDREW BRANIFF
                                                (IN Bar No. 23430-71)
                                                Deputy Chief
                                                ROBERT RICH
                                                (DC Bar No. 1016908)
                                                YOUNG CHOI
                                                (CA Bar No. 327027)
                                                Trial Attorneys
                                                Employment Litigation Section
                                                Civil Rights Division
                                                United States Department of Justice
                                                950 Pennsylvania Ave., N.W.
                                                Washington, D.C. 20530
                                                (202) 598-9898
                                                Robert.Rich@usdoj.gov

                                                *Counsel for Defendants*


## CERTIFICATE OF SERVICE

I certify that, on August 29, 2022, I electronically filed a copy of the foregoing document with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all counsel of record.

                                                /s/ Robert Rich
                                                ROBERT RICH