# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **CHRISTIAN BRUCKNER**, *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>**JOSEPH R. BIDEN, JR.**, *et al.*,<br><br>**Defendants.** | **Case No. 8:22-cv-1582-KKM-SPF** |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Defendants move to dismiss Plaintiffs' Verified Complaint Challenging the Constitutionality of the Infrastructure Investment and Jobs Act, ECF No. 1 (Complaint), for three primary reasons. *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6), 12(b)(7). First, this Court lacks subject matter jurisdiction over Plaintiffs' equal protection claim. Second, even if this Court finds jurisdiction, Plaintiffs have failed to state an equal protection claim upon which relief can be granted. Third, by failing to name as a defendant a state or local agency that receives U.S. Department of Transportation (DOT) funds under the statute Plaintiffs challenge, they have failed to join an indispensable party.

Finally, even if the Court does not dismiss Plaintiffs' Complaint, it should dismiss President Joseph R. Biden, Jr., and White House Senior Advisor Mitchell J. Landrieu as defendants because a claim against each of these individuals in his official

capacity is, in effect, a claim against a governmental entity for which the United States is the proper defendant.

## LEGAL MEMORANDUM

## BACKGROUND

## I.     Statutory Background

The Infrastructure Investment and Jobs Act was signed into law on November 15, 2021. *See* Pub. L. No. 177-58, 135 Stat. 429 (Nov. 15, 2021).[1] As part of the Act, Congress reauthorized the U.S. Department of Transportation's Disadvantaged Business Enterprise program (the DOT DBE program), which as in prior reauthorizations provides that "[e]xcept to the extent that the Secretary determines otherwise, not less than 10 percent of the amounts made available for" specified federally-funded highway and transit programs "shall be expended" through DBEs. Pub. L. No. 117-58, § 11101(e), 135 Stat. at 448–50. DBEs are businesses owned by socially and economically disadvantaged individuals. 49 C.F.R. § 26.5. Individuals in certain groups are presumed socially and economically disadvantaged, but any small business owner who meets the economic requirements may apply. *Id.* § 26.67(d).[2] The program is implemented through long-standing DOT regulations in 49 C.F.R. part 26, under which the Secretary of Transportation has exercised the authority afforded him

---

[1] Available here: https://www.congress.gov/bill/117th-congress/house-bill/3684/text. "The Court may take judicial notice of government publications and website materials." *Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216, 1220 n.4 (S.D. Fla. 2018).
[2] Plaintiffs have not alleged they have applied for the program nor that they could qualify for the economic requirements of a DOT DBE that apply to all applicants regardless of race or gender. 49 C.F.R. § 26.67(b)(1)(i).

by Congress to, among other things, prohibit the use of quotas and permit the use of race- and gender-conscious means only if DBE participation goals cannot be met through race- and gender-neutral means. *See infra* Argument II. In 1983, Congress enacted the first DBE program[3] and has since reauthorized the program for highway and transit projects in surface transportation bills.[4]

Most recently, in reauthorizing the DOT DBE program in the Infrastructure Investment and Jobs Act (Infrastructure Act) in 2021, Congress found that "while significant progress has occurred due to the establishment of the disadvantaged business enterprise program, discrimination and related barriers continue to pose significant obstacles for minority- and women-owned businesses seeking to do business in Federally assisted surface transportation markets across the United States."[5] Congress then determined that factual findings of the continuing barriers, due to discrimination and its lingering effects, served as a factual predicate for "the continuation of the disadvantaged business enterprise program."[6]

## II.    Plaintiffs' Complaint

On July 13, 2022, Plaintiffs filed suit challenging DOT's implementation of

---

[3] *See* Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f) (1983).
[4] *See* Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. No. 100-17, § 106(c) (1987); Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, § 1003(b)(1) (1991); Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, § 1101(b)(1) (1998); Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-59, § 1101(b)(2) (2005); Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-141, § 1101(b)(3) (2012); Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 1101(b)(3) (2015).
[5] Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58, § 11101(e)(1)(A) (2021).
[6] *Id.* § 11101(e)(1)(B).

§ 11101(e)(3) of the Infrastructure Act. *See generally* Compl. Plaintiff Christian Bruckner, who identifies as white and disabled, alleges that he owns Project Management Corporation, a for-profit corporation and also a Plaintiff in this action, which can fulfill transportation and infrastructure-related contracts. *Id.* ¶¶ 2, 7.[7] Plaintiffs allege that, although "Congress attempted to justify . . . race-and-gender classifications" in the Infrastructure Act, its findings do not show it was "attempting to remedy a specific and recent episode of intentional discrimination that it had a hand in." *Id.* ¶ 22. Consequently, Plaintiffs allege, they "cannot compete on an equal footing for contracts under the Infrastructure Act with businesses that are owned by women and certain racial minorities," causing them to suffer "ongoing harm to their dignity." *Id.* ¶¶ 25, 26. Plaintiffs, however, fail to allege that they have submitted a bid on a contract receiving funds from the Infrastructure Act. Nevertheless, Plaintiffs allege that the Infrastructure Act's classifications violate equal protection, and they seek injunctive and declaratory relief. *Id.* ¶¶ 36, 37 & at 11.

## LEGAL STANDARDS

### I.     Rule 12(b)(1)

"[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case[.]" *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001). The plaintiff bears the burden of proving that subject matter jurisdiction exists. *Thompson v. McHugh*, 388

---

[7] Defendants accept the allegations in the Complaint as true at this stage of the proceedings, as they must. *See* Fed. R. Civ. P. 12(b). However, Defendants in no way concede the allegations' truth.

F. App'x 870, 872 (11th Cir. 2010). A Rule 12(b)(1) motion to dismiss may facially or factually challenge a plaintiff's complaint for lack of subject matter jurisdiction. *McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). A facial attack on a complaint requires the Court to determine if the plaintiff has sufficiently advanced a basis for subject matter jurisdiction. *Id.* When deciding whether to grant a motion to dismiss based on a facial challenge to subject matter jurisdiction, the Court takes the allegations in the complaint as true. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). Conversely, a factual attack challenges the existence of subject matter jurisdiction in fact, regardless of the basis that the plaintiff has alleged in the complaint. *McElmurray*, 501 F.3d at 1251. When deciding whether to grant a motion to dismiss based on a factual challenge, "matters outside the pleadings, such as testimony and affidavits, are considered." *Lawrence*, 919 F.2d at 1529 (quotation and citation omitted).

## II.     Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to the plaintiff, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), but "[l]egal conclusions without adequate factual support are entitled to no assumption of truth," *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations that are merely

consistent with a defendant's liability fall short of being facially plausible." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (internal quotations omitted). Moreover, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and alteration omitted). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

## III.    Rule 12(b)(7)

In assessing whether a case should be dismissed for failure to join an indispensable party, the Court first considers three factors to determine whether an entity is a required party under Rule 19(a): "(1) whether complete relief can be accorded among the parties already in the case without joinder; (2) whether the absent entity's ability to protect its own interest will be impaired; and (3) whether any existing parties might be subject to risk of multiple or inconsistent obligations." *Jackson v. Advanced-Pro Commc'ns*, 2010 WL 11623571, at *1 (M.D. Fla. July 7, 2010) (citing Fed. R. Civ. P. 19(a)(1)). Second, if the Court determines that an entity should be joined but cannot because joinder would divest it of jurisdiction, the Court must then inquire whether, after applying the factors in Rule 19(b), the litigation should continue. *See Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.*, 669 F. 2d 667, 669 (11th Cir. 1982).

In making this determination, "pragmatic concerns, especially the effect on the

parties and the litigation, control." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1279–80 (11th Cir. 2003). If the entity is a required party, and cannot be joined, the Court "must analyze the factors outlined in Rule 19(b) to determine whether 'in equity and good conscience, the action should proceed among the existing parties or should be dismissed.'" *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 847 (11th Cir.1999) (citing Fed. R. Civ. P. 19(b)).[8]

## ARGUMENT

## I.   The Court Lacks Subject Matter Jurisdiction over Plaintiffs' Claim.

Plaintiffs lack standing because, on the face of their Complaint, they have not plausibly alleged an injury in fact. A favorable decision by the Court cannot redress the speculative, vague harms Plaintiffs raise. Moreover, this case is not justiciable because Plaintiffs' claims are unripe. For these reasons, the Court lacks subject matter jurisdiction over their equal protection claim.[9]

### A.   Plaintiffs Have Not Alleged an Injury in Fact.

To establish an injury in fact, a plaintiff must plead that "it suffered 'an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1271 (11th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). "A concrete injury must be *de facto*: that is, it must actually exist, as opposed to being

---

[8] Defendants have the burden of demonstrating that an entity is indispensable. *See Axiom Worldwide, Inc. v. Becerra*, 2009 WL 1347398, at *3 (M.D. Fla. May 13, 2009) (citation omitted).
[9] Thus, Defendants' challenge to Plaintiffs' Article III standing is "facial," while their challenge to the ripeness of Plaintiffs' claim is "factual." *See Lawrence*, 919 F.2d at 1528–29.

hypothetical or speculative." *Salcedo v. Hanna*, 936 F.3d 1162, 1167 (11th Cir. 2019) (quoting *Spokeo*, 578 U.S. at 340) (quotation marks omitted); *see also Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 925 (11th Cir. 2020) ("A lot of ink has been spilled to explain what concrete means, but the best word may also be the simplest—'real.'") (citing *Spokeo*, 578 U.S. at 340).

Similarly, the Supreme Court has explained that "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992) (emphasis in original) (internal quotations and citations omitted). The Supreme Court further explained that the "'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (citation omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) ("The plaintiff must show that he . . . is immediately in danger of sustaining some direct injury[.]").

Here, Plaintiffs allege that they "cannot compete equally for all contracts available under the Infrastructure Act, specifically $37 billion in set asides for women and certain racial groups," which constitutes an "ongoing harm to their dignity because of the Infrastructure Act's unlawful race and gender discrimination." Compl. ¶ 26. This is insufficient for harm because the Infrastructure Act "at most *authorizes—*

but does not *mandate* or *direct*"—the use of preferences for economically disadvantaged individuals. *Id.* at 412 (emphases in original). Plaintiffs fail to allege that they have submitted a single bid on a contract receiving funds from the Infrastructure Act, and thus any injuries arising from their purported inability to compete equally for all contracts are not "real." *Muransky*, 979 F.3d at 925. Plaintiffs fail to carry their burden to "clearly and specifically set forth facts sufficient to satisfy" Article III standing requirements. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). And the Court has no duty to "imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none." *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229–30 (11th Cir. 2000) (citing *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1210 (11th Cir. 1991)); *see also id.* ("If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury.").

Moreover, Plaintiffs' alleged injuries "rel[y] on a highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). Plaintiffs' alleged inability to compete equally for Infrastructure Act contracts and the ensuing harm to their dignity are not "certainly impending." Plaintiffs have not alleged they submitted a bid to any Infrastructure Act DOT-fund recipient, much less asserted that they missed out on a contract because of the DOT DBE goal on that project, if any. Indeed, Plaintiffs fail to allege that they have *ever* contracted with a DOT-fund recipient in the past. *See generally* Compl. At most,

Plaintiffs have only alleged that they are "qualified, willing, and able to apply for contracts" under the Infrastructure Act. *Id.* ¶ 35. This allegation is insufficient to establish an injury in fact, as it presupposes a number of events that have not occurred and may never occur. For example, it assumes: (1) a state or local agency receiving Infrastructure Act funding would establish an overall goal for DBE participation that it intends to meet, at least in part, through race- and gender-conscious means; (2) in order to meet the portion of that goal that cannot be met through race- and gender-neutral means alone, the state or local agency sets a *contract-specific* DBE goal for a project that will receive Infrastructure Act funding; (3) Plaintiffs submit a bid as a subcontractor to a prime contractor that has bid for a state or local project that has received funding under the Infrastructure Act; (4) Plaintiffs' bid is lower than that for a proposal submitted by a DBE firm; (5) the prime contractor wins the contract incorporating a DBE subcontractor in its bid instead of Plaintiffs in order to meet the DBE project goal, *see* 49 C.F.R. § 26.51(a); and (6) Plaintiffs exhaust their administrative remedies and lose any appeals. To date, not even *one* of these speculative events has occurred, and Plaintiffs' Complaint fails to allege that this status quo will change or any facts to the contrary. Consequently, they confront precisely the kind of "highly attenuated chain of possibilities" that is insufficient to establish injury in fact. *Clapper*, 568 U.S. at 410. In sum, Plaintiffs have failed to show that their asserted abstract injuries are "concrete," *Jacobson*, 974 F.3d at 1271, "imminent," *Lujan*, 504 U.S. at 560, or "certainly impending," *Clapper*, 568 U.S. at 409, and therefore have no injury in fact.

## B. A Favorable Decision by the Court Is Unlikely to Redress Plaintiffs' Alleged Injury.

Plaintiffs also lack standing because a favorable decision by this Court would not likely redress Plaintiffs' alleged injury. *See Salcedo*, 936 F.3d at 1166 (requiring a plaintiff to show that an injury in fact "is likely to be redressed by a favorable judicial decision") (quoting *Spokeo*, 578 U.S. at 338); *see also Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984) ("The 'fairly traceable' and 'redressability' components of the constitutional standing inquiry were initially articulated by this Court as 'two facets of a single causation requirement.'") (citing Charles Alan Wright, *Law of Federal Courts* § 13 (4th ed. 1983)). To be a redressable injury, the Court must determine, first, whether "a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010) (quotation and citation omitted). Second, "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (quotation and citation omitted). Taken together, "the plaintiff needs to show that the defendant harmed him, and that a court decision can either eliminate the harm or compensate for it." *Muransky*, 979 F.3d at 924.

Plaintiffs have failed to allege that the relief they seek—namely, a declaratory judgment that § 11101(e)(3) of the Infrastructure Act is unconstitutional and an injunction against Defendants prohibiting them "from applying race and gender-based

classifications when awarding contracts," Compl. at 11—would suffice to redress their alleged injury because they have failed to make any allegations with respect to their economic disadvantage, if any. *See, e.g.*, *id.* ¶ 20 (reciting the text of 13 C.F.R. § 124.104(a) verbatim without alleging it applies to Plaintiffs). But as Plaintiffs themselves must concede, the provision of the Infrastructure Act that they challenge requires the expenditure of funds "through small business concerns owned and controlled by socially *and economically disadvantaged* individuals." *Id.* ¶ 15 (quoting the Infrastructure Act) (emphasis added).

Similarly, Plaintiffs have failed to allege that, in the absence of a favorable decision by the Court, they are unable to apply for DBE certification themselves. *See* 49 C.F.R. § 26.67(d) (explaining how firms "owned and controlled by individuals who are not presumed to be socially and economically disadvantaged . . . may apply for DBE certification"). Even if the Court enjoined the use of the race- and gender-conscious presumptions of disadvantage in § 11101(e)(3), the economic requirements would still survive and Plaintiffs would still need to establish economic disadvantage to be able to "compete on an equal footing for contracts under the Infrastructure Act" with DBE firms. Compl. ¶ 25; *see Cache Valley Elec. Co. v. Utah Dep't of Transp.*, 149 F.3d 1119, 1123 (10th Cir. 1998) (holding that plaintiff lacked standing to challenge DOT DBE program because "any anticipated redress from a favorable decision is wholly speculative" and that plaintiff "adduced no evidence that the elimination of the preferences would result in any meaningful reduction in the number of qualifying DBEs"); *Klaver Constr. Co., Inc. v. Kan. Dep't of Transp.*, 211 F. Supp. 2d 1296, 1304–05

(D. Kan. 2002) (holding that plaintiff lacked standing because "even if the Court were to declare rebuttable presumptions unconstitutional and enjoin their use, [plaintiff's] alleged diminished competitiveness would not be materially altered because [plaintiff] would still be ineligible to participate in the DBE program for race- and gender-neutral reasons"); *Interstate Traffic Control v. Beverage*, 101 F. Supp. 2d 445, 453 (S.D. W. Va. 2000) (same reasoning as *Cache Valley*). But Plaintiffs have failed to even allege that they are economically disadvantaged or that this requirement has no rational basis. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1245 (11th Cir. 2003) (employing rational basis review to evaluate equal protection challenge that did not involve racial classifications) (citation omitted). Because even a favorable decision would not "amount to a significant increase in the likelihood that [Plaintiffs] would obtain relief that directly redresses" their alleged inability to compete on an equal footing for contracts under § 11101(e)(3), *Harrell*, 608 F.3d at 1260 n.7, Plaintiffs have failed to establish even the first element of redressability.

### C.    Plaintiffs' Claims Are Unripe for Review.

Even if the Court determines that Plaintiffs have Article III standing to bring an equal protection claim, it is not ripe for this Court's review. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–581 (1985)). The ripeness inquiry requires the Court "to evaluate both the fitness of the issues for judicial

decision and the hardship to the parties of withholding court consideration." *Id.* at 300–01 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). In evaluating "fitness" and "hardship," the Eleventh Circuit considers: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001) (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

Here, all factors weigh against review of Plaintiffs' equal protection claim. First, delayed review would not cause any hardship to Plaintiffs because they have not alleged that they have submitted a bid to a prime contractor for a sub-contract on a project that receives funding under the Infrastructure Act—much less been denied a sub-contract by a prime contractor in favor of a DBE subcontractor. On the other hand, judicial intervention would unquestionably interfere with further administrative action by the DOT. *See* ECF No. 29-4 (McCallum Decl.) ¶¶ 6–7; ECF No. 29-5 (Kenley Decl.) ¶¶ 7–8. Under the Infrastructure Act, roads and transit projects currently are being funded and built. *Id.* Contract bids are being submitted to state and local DOT-fund recipients. *Id.* Even if the Court limits the scope of relief to otherwise exempting Plaintiffs from § 11101(e)(3) of the Infrastructure Act, this limited relief would still substantially disrupt the administration and allocation of what Plaintiffs themselves describe as "$370 billion in new spending for roads, bridges, and other surface transportation projects," Compl. ¶ 1, by requiring multiple government agencies in any

14

state to, among other things, implement and observe court-ordered exceptions for any project with race- and gender-conscious goals for which Plaintiffs are contemplating submitting bids to prime contractors bidding on the project. *See* ECF No. 29-4 (McCallum Decl.) ¶ 8. This unprecedented administrative burden should only be imposed under the most extraordinary circumstances, which Plaintiffs cannot allege.

## II.    Plaintiffs Fail to State a Claim for Relief.

Even if the Court finds that it has jurisdiction to hear this matter, Plaintiffs have failed to state an equal protection claim upon which relief can be granted because, accepting all allegations in the Complaint as true,[10] the DOT DBE program is facially constitutional. Plaintiffs allege that § 11101(e)(3), which provides that Infrastructure Act funds "shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals," constitutes a "quota" that cannot survive strict or intermediate scrutiny. Compl. ¶¶ 15, 31. "Under strict scrutiny, an affirmative action program must be based upon a 'compelling governmental interest' and must be 'narrowly tailored' to achieve that interest." *Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cty.*, 122 F.3d 895, 906 (11th Cir. 1997) (citing *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1564 (11th Cir. 1994)). Here, both controlling legal authority as well as documents in the public record of which the Court

---

[10] Defendants note, however, that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Randall v. Scott*, 610 F.3d 701, 708 (11th Cir. 2010) (quotation and citation omitted). And when the "Factual Background" of Plaintiffs' Complaint is not simply reciting statutory provisions, it is offering numerous legal conclusions. *See, e.g.*, Compl. ¶ 22 (alleging that no Congressional findings "establish that Congress is attempting to remedy a specific and recent episode of intentional discrimination that it had a hand in").

may take judicial notice[11] show that, regardless of whether Plaintiffs could "compete on an equal footing" in the absence of § 11101(e)(3), Compl. ¶ 25, the DOT DBE program serves a compelling governmental interest and is narrowly tailored to achieve it.[12] And as Defendants have previously noted, every court of appeals to consider the DOT DBE program has upheld it. *See* ECF No. 29 at 12–16 (citing *Midwest Fence Corp. v. Dep't of Transp.*, 840 F.3d 932, 941, 935–36 (7th Cir. 2016); *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 995 (9th Cir. 2005); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 967–68 (8th Cir. 2003); *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1155 (10th Cir. 2000)).

## A. The DOT DBE Program Serves a Compelling Governmental Interest.

The government must have "a strong basis in evidence for its conclusion that such action was necessary" to further its compelling interests, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989), which it may establish through persuasive statistical data and anecdotal evidence. *Eng'g Contractors*, 122 F.3d at 907. In cases applying strict scrutiny, the Eleventh Circuit has instructed that "remedying past or present discrimination" is widely accepted as a compelling governmental interest, and thus the constitutional analysis hinges on "the adequacy of the evidence of discrimination offered to show that interest." *Ensley Branch*, 31 F.3d at 1564 (citations

---

[11] *See Driessen v. Barclays Bank, PLC*, 2022 WL 3042940, at *2 (11th Cir. Aug. 2, 2022) ("A court can take judicial notice of matters of public record when considering a Rule 12(b)(6) motion, at least where the truth of the statements in such records is not at issue for purposes of the motion to dismiss.") (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278, 1280 & nn.10, 15 (11th Cir. 1999)).

[12] Because Defendants can establish that the DOT DBE program meets the higher standard of constitutional scrutiny for race-based programs, as opposed to intermediate scrutiny for gender-based programs, Defendants focus on that level of constitutional analysis in this motion.

16

omitted). In *Engineering Contractors Association of South Florida, Inc. v. Metropolitan Dade County*, the Eleventh Circuit summarized the types of evidence appropriate in this analysis and found that an "amorphous claim of societal discrimination" would not withstand scrutiny, but courts could rely on "statistical disparities between the proportion of minorities hired and the proportion of minorities willing and able to do the work." 122 F.3d at 906–07. "Anecdotal evidence may also be used to document discrimination, especially if buttressed by relevant statistical evidence." *Id.* (internal quotations and citations omitted). Also, because the government "need not have produced such evidence before adopting the remedy . . . the Government is not precluded from presenting post enactment evidence to establish a compelling governmental interest in this case." *Id.*[13]

In this context, "[w]here there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise." *Croson*, 488 U.S. at 509; *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice]

---

[13] However, formal findings by a government entity "need neither precede nor accompany the adoption of affirmative action." *Ensley Branch*, 31 F.3d at 1565; *see also Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267, 286 (1986) (rejecting any formal findings requirement). In *Ensley Branch*, the Eleventh Circuit allowed the government to justify its affirmative action plans post-hoc using any evidence available to it. *See* 31 F.3d at 1568 ("If the City and Board can now show strong evidence of the need for affirmative action in a department, then future affirmative action in that department is justified.").

bears more heavily on one race than another.").

This exact type of evidence demonstrating the persistence of discrimination and its lingering effects is evident in the transportation construction industry and supports the constitutionality of the Infrastructure Act. Since 2010, over 200 disparity studies, other reports and studies, and congressional testimony document discrimination and its lingering effects that continue to affect the ability of DBEs to compete equally for government contracts. *See* ECF 29-1 (Compelling Interest Report).[14]

Of particular consequence are the hundreds of disparity studies that were submitted to Congress in advance of the reauthorization of the DOT DBE program. In 2020, the House Committee on Transportation and Infrastructure "amassed an enormous amount of evidence providing an exceedingly strong basis for the conclusion that discrimination against minority- and women-owned businesses continues to affect the construction, architecture and engineering, and related surface transportation contracting markets nationwide."[15] In June 2021, Congress received over 100 disparity studies published from 2015 to 2021 as evidence of discrimination

---

[14] Defendants request the Court to take judicial notice of the Compelling Interest Report. *See Dimanche v. Brown*, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015) (citing *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. 1981) ("Absent some reason of mistrust, courts have not hesitated to take judicial notice of agency records and reports.")). The Compelling Interest Report has been introduced in Congress. *See* 168 Cong. Rec. E619-20 (daily ed. June 14, 2022) (statement of Rep. Carolyn Maloney). The 2022 report updated and expanded upon a 2010 DOJ Report on the same topic, which also was considered by Congress and cited in federal court as evidence of a compelling governmental interest in the use of race-conscious measures to support the ability of people of color to compete on an equal basis. *See Midwest Fence Corp. v. United States Dep't of Transp.*, No. 10 C 5627, 2011 WL 2551179, at *12 (N.D. Ill. June 27, 2011).

[15] H.R. Rep. No. 116-437, at 331 (2020).

and its lingering effect based on both race and gender in support of the reauthorization of the DOT DBE program.[16] In June 2021, Congress made specific findings as to the value of such studies: "[D]isparity studies contain myriad analyses aimed at answering the question: 'Does business discrimination based on race or gender continue to exist?' Even a cursory review of the studies reveals that the answer is resoundingly 'yes.'"[17] Congress also reviewed studies that showed significant underutilization of DBEs in government-funded contracts and the positive impact of the DOT DBE program.[18]

Disparity studies include additional evidence and statistical methods that tie the disparities to discrimination, including regression analyses, statistical significance— which eliminates the possibility that the disparities could be due to random chance— and surveys, interviews, and other qualitative evidence that document the personal accounts of business owners and identify the discriminatory barriers that contribute to many of the disparities. *See* ECF No. 29-2 (Wainwright Report), at 17–19. Given the rich body of quantitative and qualitative evidence they provide, it is unsurprising that courts consistently find that disparity studies provide persuasive evidence of discrimination and its continuing effects. *See, e.g.*, *Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1196 (9th Cir. 2013); *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 257 (4th Cir. 2010); *Adarand Constructors, Inc. v. Slater*,

---

[16] 167 Cong. Rec. H3505-07 (daily ed. June 30, 2021) (statement of Rep. DeFazio) (listing disparity studies); 167 Cong. Rec. S5898-99 (daily ed. August 5, 2021) (statement of Sen. Tom Carper) (same).
[17] H.R. Rep. No. 117-70, at 392–95 (2021).
[18] 167 Cong. Rec. S5898 (2021). The House Committee on Transportation and Infrastructure reviewed these studies, many of which found that disparities between DBEs and non-minority male businesses are "far greater than the disparities that persist in the public sector where remedial programs are more routine." H.R. Rep. 117-70, at 393 (2021).

228 F.3d at 1174; *Midwest Fence*, 84 F. Supp. 3d 705, 727 (N.D. Ill. 2015); *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 107 F. Supp. 3d 183, 209–10 (D.D.C. 2015).

Expert reports have also identified substantial disparities in direct federal government contracting and conducted regression analyses that eliminate potentially non-discriminatory reasons for the disparities. *See* ECF 29-3 (Chow Report).[19] For example, using federal contracting data from April 2019 to August 2020, Chow utilized regression analyses to determine that small disadvantaged businesses (SDBs) were much less likely to win federal contracts relative to non-SDBs with similar size, age, receipts and other characteristics. *Id*. at 2.

The statistical evidence demonstrating the disparities in government contracting between DBEs and their non-minority, male-owned counterparts is bolstered by evidence showing the various ways discrimination hinders the ability of minority- and women-owned businesses to compete equitably for government contracts. While discrimination can take many forms, primary obstacles include: (1) discrimination by procurement agencies and prime contractors; (2) exclusion from business networks; and (3) discrimination limiting access to capital and other resources. *See* ECF 29-1 (Compelling Interest Report), at 19–34. Female and minority business owners experience "outright prejudicial treatment, attitudes [and] stereotypes" by procurement agencies and prime contractors. *Id*. at 54. Additionally, they lack access

---

[19]   The Chow Report was reviewed by Congress. *See* "Are Governmentwide Contracts Helping or Hurting Small Contractors?": Hearing before H. Comm. On Small Business, 117th Cong. (2022) 63–84.

to business networks, which affects their ability to compete equally for government contracts.[20] As a result, minority and female businesses owners are reliant on loans, yet are far less likely than white male business owners to obtain them. *See id.* at 30.

## B.     The DOT DBE Program Is Narrowly Tailored on its Face.

The narrow tailoring inquiry requires a court to consider: (1) "the necessity for the relief and the efficacy of alternative remedies"; (2) "the flexibility and duration of the relief, including the availability of waiver provisions"; (3) "the relationship of the numerical goals to the relevant labor market"; and (4) "the impact of the relief on the rights of third parties." *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1282 (M.D. Fla. 2021) (quoting *United States v. Paradise*, 480 U.S. 149, 171 (1987)).

First, the DOT DBE program's implementing regulations expressly provide for the consideration of race-neutral alternatives. DOT-fund recipients must have a DBE program of their own, 49 C.F.R. § 26.21, with each recipient establishing its own annual goal for DBE participation in federally-funded projects based on local market conditions and upcoming projects in its location. *Id.* § 26.45. Significantly, those recipients must always attempt to meet the goal by using race- and gender-neutral means to the maximum extent possible. *Id*. § 26.51(a). The regulations expressly prohibit the use of quotas, and recipients may not set aside contracts for DBEs except "in limited and extreme circumstances . . . when no other method could be reasonably

---

[20] *See, e.g.*, Examining the Racial and Gender Wealth Gap in America: Hearing Before Subcomm. on Diversity and Inclusion of the H. Comm. on Financial Servs., 116th Cong. (2019) 5, 105 (statement of Kilolo Kijakazi).

expected to redress egregious instances of discrimination." *Id*. § 26.43.

Second, the DOT DBE program is substantially flexible. The 10% goal of which Plaintiffs complain, *see, e.g.*, Compl. ¶ 4, is actually "an aspirational goal at the national level, which [DOT] uses as a tool in evaluating and monitoring DBEs' opportunities to participate in DOT–assisted contracts." 49 C.F.R. § 26.41(b). It does not establish any penalties for failing to meet the 10% aspirational goal and "does not authorize or require recipients to set overall or contract goals at the 10 percent level, or any other particular level, or to take any special administrative steps if their goals are above or below 10 percent." *Id.* § 26.41(c).

Third, the DOT DBE program closely tethers its numerical goals for DBE participation to the relevant labor markets. *See id.* § 26.45(b) (requiring that a recipient's "overall goal must be based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on your DOT-assisted contracts"). It further requires recipients to follow a step-by-step procedure for establishing realistic participation goals by considering, among other things, the likely number of minority contractors that would have received federal funds but for the effects of past discrimination. *Id.* § 25(c)–(h).

Finally, the DOT DBE program attempts to minimize the impact of any race- or gender-based classifications on the rights of non-minority third parties. For example, the presumption of economic disadvantage for both minority and female applicants may be rebutted in two ways: if the business owner has a personal net worth in excess of $1.32 million or is able to accumulate substantial wealth. And the

regulations provide a mechanism for individualized determinations of social and economic disadvantage for non-minority applicants. *See* § 26.67(b) (describing the processes by which a presumption of economic disadvantage for minority or female applicants may be rebutted); *id.* § 26.67(d) (describing the process by which firms "owned and controlled by individuals who are not presumed to be socially and economically disadvantaged . . . may apply for DBE certification").

### III.    Plaintiffs Have Failed to Join an Indispensable Party.

Plaintiffs fail to name any state or local agency that receives DOT funds under § 11101(e) of the Infrastructure Act as a defendant. In assessing whether a case should be dismissed for failure to join an indispensable party, courts follow a two-step inquiry. In the first step, the Court considers three factors to determine whether a party is required to be joined under Rule 19: "(1) whether complete relief can be accorded among the parties already in the case without joinder; (2) whether the absent entity's ability to protect its own interest will be impaired; and (3) whether any existing parties might be subject to risk of multiple or inconsistent obligations." *Jackson*, 2010 WL 11623571, at *1. As discussed previously, DOT's DBE regulations require recipients of DOT funds to have a DBE program of their own, and thus recipients, not the DOT, administer their own DBE programs and set goals for DBE participation in federally-funded projects. Plaintiffs have thus failed to join an indispensable party as required by Rule 19, and this failure is fatal to their equal protection claim.

While Plaintiffs name Secretary Buttigieg, and by extension the federal DOT, as a defendant, they do not identify any state or local agency that uses race- or gender-

conscious goals for federally-funded contracts to which Plaintiffs have submitted or plan to submit a bid, let alone *any* state or local agency receiving DOT funds that implements a DBE program, as a defendant.[21] Thus, complete relief cannot be afforded in a DOT-fund recipient's absence, as the named federal defendants cannot stop recipients from continuing to implement their own race- or gender-conscious goals for federally-funded projects.[22] Further, because Plaintiffs fail to identify *any* DOT-fund recipient in their Complaint, it is not even feasible to examine whether a state or local entity can be joined in this lawsuit—for instance, due to common obstacles to joinder like jurisdiction and sovereign immunity. *See* Fed. R. Civ. P. 19(b). Accordingly, this Court should dismiss Plaintiffs' equal protection claim, or, if it determines that Plaintiffs may proceed, require them to name a state or local agency as a defendant.

## IV.  The Court Should Dismiss President Biden and Mitchell Landrieu as Defendants.

Even if the Court does not dismiss Plaintiffs' Complaint, it should dismiss as defendants President Biden and Mitchell Landrieu, in their official capacities, *see* Compl. ¶¶ 8, 9, and substitute the United States as the proper defendant. "Official-capacity suits . . . generally represent only another way of pleading an action against

---

[21] Though a DOT-fund recipient generally cannot continue to set race- and gender-conscious goals on federally-funded projects if a DOT DBE program is deemed unconstitutional, it may still be able to do so if there is a separate DBE program authorized under state law that permits such goals on federally-funded projects.

[22] Moreover, previous plaintiffs who have challenged the DOT DBE program have generally named a state entity as a codefendant to the federal DOT. *See, e.g.*, *Midwest Fence*, 840 F.3d at 932; *W. States Paving*, 407 F.3d at 983; *Sherbrooke Turf*, 345 F.3d at 964; *Adarand Constructors*, 228 F.3d at 1147; *Geyer Signal, Inc. v. Minn. Dep't of Transp.*, Civ. No. 11-321, 2014 WL 1309092, at *12–17 (D. Minn. Mar. 31, 2014); *see also Geod Corp. v. N.J. Transit Corp.*, 678 F. Supp. 2d 276 (D.N.J. 2009) (naming state defendants only).

an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quotation and citation omitted). Thus, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166 (citation omitted); *see also Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) ("The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter.").

Even taking Plaintiffs' allegations that President Biden "is personally involved in the implementation of the Infrastructure Act" and that Mr. Landrieu is similarly involved, Compl. ¶¶ 8, 9, as true for purposes of this motion, Plaintiffs' claim against these individuals is, "in all respects other than name, to be treated as a suit against" the United States. *Graham*, 473 U.S. at 166; *see also id.* ("It is *not* a suit against the official personally, for the real party in interest is the entity.") (emphasis in original). Likewise, a judgment, including any judgment that includes declaratory or injunctive relief, would operate as a judgment against the United States and, specifically, the U.S. Department of Transportation. And because Secretary Buttigieg is a named defendant, has received notice of the suit and an opportunity to respond, and is participating in the suit, *see id.*, the Court should, if it allows Plaintiffs' claim to proceed, dismiss President Biden and Mr. Landrieu, in their official capacities, as defendants.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss Plaintiffs' Complaint.

Dated: September 27, 2022

Respectfully submitted,

JOHN E. PUTNAM
  *General Counsel*
PAUL M. GEIER
  *Assistant General Counsel*
  *for Litigation and Enforcement*
PETER J. PLOCKI
  *Deputy Assistant General Counsel*
  *for Litigation and Enforcement*
CHARLES E. ENLOE
  *Senior Trial Attorney*
*U.S. Department of Transportation*

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

KAREN D. WOODARD
Chief
Employment Litigation Section
Civil Rights Division

/s/ Robert Rich
ANDREW BRANIFF
(IN Bar No. 23430-71)
Deputy Chief
ROBERT RICH
(DC Bar No. 1016908)
YOUNG CHOI
(CA Bar No. 327027)
Trial Attorneys
Employment Litigation Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 598-9898
Robert.Rich@usdoj.gov

*Counsel for Defendants*

## LOCAL RULE 3.01(g) CERTIFICATION

Defendants certify that they have conferred with Plaintiffs regarding the relief sought by this motion on September 26 and 27, 2022, via email and telephone. Plaintiffs indicated that they oppose the relief that Defendants seek.

/s/ Robert Rich
ROBERT RICH

**CERTIFICATE OF SERVICE**

I certify that, on September 27, 2022, I electronically filed a copy of the foregoing document with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all counsel of record.

/s/ Robert Rich
ROBERT RICH