UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

---

CHRISTIAN BRUCKNER, et al.,

                Plaintiffs,                Case No.: 8:22-cv-1582-KKM-SPF

   v.

JOSEPH R. BIDEN, JR., et al.,

                Defendants.

---

**PLAINTIFFS' REPLY IN SUPPORT OF
AMENDED MOTION FOR PRELIMINARY INJUNCTION**

---

## INTRODUCTION

Since the 1980s, federal agencies have taken the same approach. They have presented federal courts with studies describing differing outcomes among groups. They have assumed that these disparities must be the result of discrimination, and then argued that the only way to cure them is through intentional discrimination against innocent individuals.

It hasn't worked. As Defendants will be the first to tell the Court, "The needle has not moved." Doc. 29-1:18. The result has been a never-ending cycle

of discrimination by the government that fails to cure social disparities, the cause of which has been the subject of considerable debate.[1]

The Constitution—and our Supreme Court—have demanded much more. While it is true that the government may, with a precise and time-limited remedy, address a specific episode of intentional discrimination involving government officials, that is not what is going on in this case. Here, Congress created, and Defendants are implementing, a nationwide $37 billion race-and-gender quota that discriminates (quite indiscriminately) against a variety of racial groups. While the quota may appear time-limited (even billions will eventually run out), Defendants concede the federal government has been setting aside money like this since at least 1983. There is no suggestion that these programs will ever stop. Certainly they won't stop of their own accord because, again, "The needle has not moved."

They ought to stop because our Constitution demands it. Racial classifications, like the one here, "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993). Such race-based programs "are simply too pernicious to permit any but the most exact connection between justification

---

[1] *See, e.g.,* Thomas Sowell, *Discrimination and Disparities* 216 (Hatchette Book Group 2019) ("One can read reams of arguments that statistical disparities imply biased treatment without finding a single empirical example of the even distribution of social groups in any endeavor, in any country or in any period of history.")

and classification." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). They cannot be based on racial disparities or systemic discrimination that is everywhere and anywhere. The reason is simple: our Constitution protects individuals from racial discrimination. It does not impose group guilt or entitlement. As Justice Scalia famously put it, "[i]ndividuals who have been wronged by unlawful racial discrimination should be made whole; but under our Constitution there can be no such thing as either a creditor or a debtor race. That concept is alien to the Constitution's focus upon the individual." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200 (1995) (Scalia, J. concurring).

"The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 748 (2007). "Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948). Defendants' statistical disparities are not compelling, and certainly do not justify this nationwide race-and-gender quota. The Constitution—to the extent it permits one at all—requires a race-based remedy to be performed with a scalpel, not a meat cleaver.

Plaintiffs' motion for a preliminary injunction should be granted.

## ARGUMENT IN REPLY

### I.     Plaintiffs Are Likely to Succeed on Discrimination Claims.

In their response, Defendants agree that the Infrastructure Act discriminates based on race and that strict scrutiny therefore applies. Doc. 29:1, 3, 11, 16. With respect to gender discrimination, Defendants similarly agree that they must show that a gender classification meets intermediate scrutiny. Doc. 29:12. In their brief, however, Defendants ask this Court to only consider strict scrutiny because Defendants contend that the quota meets that high bar. Doc. 29:16, n.10. It does not, however.

### A.     Defendants' generalized statistical disparities and anecdotes are not a "strong basis" in evidence supporting a compelling interest.

Defendants do not dispute the compelling-interest test as articulated by Judge Thapar in *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021), which struck down another federal program prioritizing billions for "disadvantaged" individuals. Applying Supreme Court precedent, Judge Thapar cogently identified a three-part test to determine whether the government can establish a compelling government interest.

First, "the policy must target a specific episode of past discrimination. It cannot rest on a 'generalized assertion that there has been past discrimination in an entire industry.'" *Id.* at 361 (quoting *City of Richmond v. J.A. Croson Co.,* Croson, 488 U.S. at 469, 498 (1989) & citing *Adarand*, 515 U.S. at 226). Second,

"there must be evidence of intentional discrimination in the past"—
"[s]tatistical disparities don't cut it." *Vitolo*, 999 F.3d at 361 (citing *Croson*, 488
U.S. at 503). Third, "the government must have had a hand in the past
discrimination it now seeks to remedy." *Vitolo*, 999 F.3d at 361 (citing *Croson*,
488 U.S. at 492 (plurality opinion)). Judge Thapar's formulation is essentially
identical to the one made in *Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade
Cnty.*, 122 F.3d 895, 907 (11th Cir. 1997) (claims of "discrimination in the
national economy" and "gross statistical disparities" are not enough, and the
government must show that the government participated in the system of
racial exclusion). Each of these rules reflects the Constitution's admonition of
individual and not collective justice.

To satisfy these three rules, the government must have had a "strong
basis in evidence for its conclusion that remedial action was necessary" "before
it embarks" on a race-based program. *Wygant v. Jackson Bd. of Educ.*, 476 U.S.
267, 277 (1986).[2] When scrutinized with these three requirements, and this
standard of proof, Defendants' nationwide $37 billion infrastructure quota is
not based on a compelling government interest.

---

[2] *Wygant*'s admonition that evidence must be in place "before" implementation
of a race-based program was not headed by Defendants here. The Infrastructure Act
was passed on Nov. 5, 2021. Now, Defendants submit to this Court reports dated
February 4, 2022, February 7, 2022, and another report that is undated.

1. **Targeting A Specific Episode of Discrimination.** Defendants' proffered evidence does not "target a specific episode of past discrimination." *Vitolo*, 999 F.3d at 361. Targeting a specific episode is important, otherwise, the government may just rely on a "generalized assertion that there has been past discrimination in an entire industry." *Croson*, 488 U.S. at 498. As the Southern District of Florida explained in *Engineering Contractors,* a "governmental assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cnty.*, 943 F. Supp. 1546, 1555 (S.D. Fla. 1996), *aff'd*, 122 F.3d 895 (11th Cir. 1997). "Societal discrimination that has prevented minorities from following the traditional path from laborer to entrepreneur cannot justify the use of race-based measures. It is sheer speculation how many minority firms would exist absent prior past societal discrimination." *Id.*

Defendants first point to their Compelling Interest Report, which allegedly "demonstrate[s] the effects of discrimination in state and local marketplaces." Doc. 29:18. The Compelling Interest Report says that it documents "the barriers and challenges that businesses owned by women or people of color face today." Doc. 29-1:4. The report highlights, among other things, "substantial and pervasive disparities" across "the vast majority of industries," "ethnic and racial groups," and "geographies." Doc. 29-1:18, 22. In

support of these claims of nationwide discrimination among multiple industries, the report catalogues "over 200 disparity studies." Doc. 29-1:18.[3]

The Compelling Interest Report, and the studies cited therein, don't identify any specific episode of discrimination (and Defendants do not contend otherwise). Instead, the report rattles off scattershot statistical disparities in "state and local jurisdictions in 34 different states and the District of Columbia." Doc. 29-1:18. The problem is evident. Such evidence is indistinct from an allegation that there has been societal discrimination resulting in group disparities. It could justify race-based remedies for all at any time. Yet that is precisely what the Supreme Court has repeatedly said may not be done.

To be sure, the Compelling Interest Report identifies some isolated anecdotes of discriminatory language, including racial slurs uttered in New Orleans in 2018 and Arizona in 2015. Doc. 29-1:23. Defendants' other "evidence" focuses on *non-discriminatory* behavior that the government labels as "the good ol' boy" network," such when a black owner of a construction company, who lost out on a bid, reported that the real reason for losing the contract was because "'[t]hey knew the guy. [The general contractor] had a working relationship with them." Doc. 29-1:23, 25.

---

[3] Page numbers reflect the blue ECF page numbers in the headers.

These statistical surveys and isolated stories of discrimination do not amount to "identified discrimination" or the "specific episode" mentioned in *Croson* and *Vitolo*. They don't tell us what has happened to this industry in this locality or what the extent of its impact may have been. Moreover, isolated anecdotal evidence "is not the sort of 'identified discrimination' contemplated by *Croson*." *Eng'g Contractors*, 943 F. Supp. at 1580 (quoting *Croson,* 488 U.S. at 505). This is because anecdotal evidence rarely involves any effort to investigate the anecdote provided. If the government identified the discriminatory act and then discriminator, the government could merely investigate and punish the offending conduct. Instead, as it does in nearly all cases, the government here relies almost exclusively on statistical evidence.

Defendants also submit two other reports from Wainwright and Chow, previously filed in the pending case *Ultima Servs. Corp. v. USDA,* No. 2:20-cv-41 (E.D. Tenn.) (summary judgment motions pending). These reports, however, do not identify a specific episode of discrimination. Neither expert identifies any specific contract, firm, or public official involved in discrimination.[4] The Wainwright and Chow reports, on the contrary, simply claim discrimination in an "entire industry," which is not a suitable basis for identifying a compelling government interest. *See Eng'g Contractors*, 943 F. Supp. at 1555.

---

[4] In fact, Defendants do not cite *any* modern lawsuit or sanction against a discriminator in the public-procurement process, and Plaintiffs are unaware of any.

2. **Evidence of Intentional Discrimination.** In addition to failing to identify a specific episode of discrimination, Defendants similarly cannot properly identify any evidence of *intentional* discrimination. Defendants' statistical evidence points to racial disparities, but these studies do not amount to a "strong basis" in evidence of intentional discrimination. *Wygant*, 476 U.S. at 277.[5] Statistics should not be "accorded talismanic significance," *Peightal v. Metro. Dade Cnty.*, 26 F.3d 1545, 1556 (11th Cir. 1994), and the statistics *must* account for "race-neutral explanation[s] for the apparent statistical disparities," *Eng'g Contractors*, 943 F. Supp. at 1576, 1573 (stating that a study submitted by Wainwright not "particularly probative"), including statistical phenomena such as "Simpson's Paradox," *Eng'g Contractors*, 122 F.3d at 919, n.4 (aggregating data can create illusory disparities).

In *Croson*, the Court described the type of statistical evidence that may be probative of intentional discrimination. To show a relevant racial disparity, studies must first identify the "relevant statistical pool," which includes only those firms with the "special qualifications" "necessary" "to undertake the particular task." *Croson*, 488 U.S. at 501–2. "In the relevant market," the

---

[5] Government agencies have documented the issues with relying on broad statistical disparity studies. *See* GAO Report GAO-01-586, "Disadvantaged Business Enterprises: Critical Information is needed to Understand Program Impact," June 2001, p. 29 (reviewing 14 contracting disparity studies and finding them methodologically flawed and therefore unreliable); U.S. Comm'n on Civil Rights, "Disparity Studies as Evidence of Discrimination in Federal Contracting," p. 76 (finding seven common flaws in most disparity studies).

government must identify who is "qualified to undertake the prime or subcontracting work in public construction projects." *Id.* at 502.

In this case, the relevant statistical pool consists of all federal contractors and subcontractors in the United States willing, qualified, and able to undertake particular tasks in contracts funded by Section 11101(e)(3) of the Infrastructure Act. *See* Doc. 1:¶15. This section identifies $370 billion of projects to be spent under Division A (surface transportation projects by the Federal Highway Administration), Division C (transit projects by the Federal Transit Administration), and 23 U.S.C. § 403 (safety projects by the National Highway Traffic Safety Administration). *Id.*; *see* Infrastructure Act, § 11101(e)(3). If a contractor is unqualified or otherwise unable to bid on these types of projects, they should not be included in the relevant statistical pool.

Disparity studies can be "both over- and under-inclusive" in their attempt to define the relevant statistical pool. *Hershell Gill Consulting Engineers, Inc. v. Miami-Dade Cnty., Fla.*, 333 F. Supp. 2d 1305, 1321 (S.D. Fla. 2004). The Compelling Interest Report is underinclusive because it doesn't consider a *nationwide* statistical pool. While it's not clear that there could ever be a nationwide case made under *Croson*—to attempt one would seem inconsistent with the notion of narrow tailoring *per se*—the report considers 189 studies from various "state and local jurisdictions in 34 different states and the District of Columbia" over the past 12 years. Doc. 29-1:18. This is not

10

the relevant pool. Sixteen states are not referenced in the report. Even within the states considered, most of the studies are about counties and municipalities and do not consider statewide evidence. Even when Defendants' report offers evidence for a particular area, many times the evidence is old and therefore not probative of intentional discrimination in need of a remedy in 2022 and beyond. For example, only two studies mention Oklahoma and both studies are from 2010. Doc. 29-1:51. Defendants seek an inference that because there has been racism at some times and places, America is a "racist" society in which public policy must be racialized. The Court has repeatedly warned against this.

Second, the Compelling Interest Report is overinclusive because it is not limited to federal contractors willing, qualified, and able to do work under the Infrastructure Act. Instead, the report considers a hodgepodge of contractors doing a variety of work in selected cities, counties, and states over the past 12 years. This is not the pool of contractors relevant to the quota under the Infrastructure Act. For example, Defendants' report cites a 2011 study by the Washington Suburban Sanitary Commission (Doc. 29-1:43), a 2015 study by the Broward County Public Schools (Doc. 29-1:43), a 2012 study about the Burbank-Glendale-Pasadena Airport Authority (Doc. 29-1:41), a 2017 study about the Atlanta Housing Authority, (Doc. 29-1:44), and a 2015 Illinois study about a "Suburban Bus" authority, (Doc. 29-1:45). These studies are not the type of strong evidence of intentional discrimination required by the caselaw.

If Defendants want to show intentional discrimination under the categories identified in the Infrastructure Act, then they should perform a study on that relevant topic considering qualified, willing, and able federal contractors.

Defendants' other reports suffer from similar flaws. The Wainwright study relies on "205 different disparity studies completed between 2010 and 2021, which collectively span 32 states and the District of Columbia and represent practically every industry segment in the U.S. economy." Doc. 29-2:8. Wainwright also looked at two national surveys reviewing businesses across "all major industry sectors" and therefore not limited to federal contractors, Doc. 29-2:9, and the "American Community Survey," which is similarly not limited to federal contractors, Doc. 29-2:10. On the other hand, instead of reviewing all businesses in all segments regardless of whether they are federal contractors, the Chow report only reviewed small businesses registered with the Small Business Administration. Doc. 29-3:6.

Furthermore, Wainwright and Chow do not properly control for non-discriminatory factors, and therefore fail to establish that the purported disparities point to *intentional* discrimination or even an innocent lack of business justification for disproportionate results. *See Eng'g Contractors,* 122 F.3d at 916–19 (describing the importance of accounting for all non-discriminatory factors in proving intentional discrimination). For example, Wainwright does not control for capacity measures, such as firm revenues,

12

employment size, and bonding limits. *See* Doc. 29-2:18, n. 26. This is a fatal error, as courts have recognized that firm size plays a major role in obtaining contracts—considering just small businesses is not probative of discrimination under the sweeping Infrastructure Act. *E.g., See Eng'g Contractors*, 122 F.3d at 917 ("More simply put: Because they are bigger, bigger firms have a bigger chance to win bigger contracts."); *Michigan Road Builders v. Milliken*, 834 F.2d 583, 592 (6th Cir. 1987) ("Small businesses, as a result of their size, were unable to effectively compete for state contracts."); *Rothe Development Corp. v. Dep't of Defense*, 545 F.3d 1023, 1042-43 (Fed. Cir. 2008) ("We are even more troubled, however by the failure of five of the studies to account sufficiently for potential differences in size, or *relative capacity*, of the businesses included in those studies.") (emphasis in original). Put differently, the studies reveal neither discriminatory purpose or effect.

Moreover, neither Chow nor Wainwright considered bidding behavior of firms, prices proposed in bids, the geographic location of the project, the dollar value of the project, the time of year, or whether a contractor had approached bonding limits. "[N]on-social factors that may distort the final result." *Eng'g Contractors,* 943 F. Supp. at 1555 (giving the following examples: "deficiencies in working capital, inability to meeting bonding requirements, unfamiliarity with bidding procedures, and disability caused by an inadequate track record").

"These problems face any new entrant into the construction industry, regardless of race." *Id.*

Bidding on federal contracts is time-intensive and expensive, *id.* at 1583, and who bids and how often impacts whether contracts are awarded. *See* Michael Kenig, *Project Delivery Systems for Building Management* 64–65 (Assoc. Gen. Contractors of Am., 1997); George R. La Noue, *Setting Goals in the Federal Disadvantaged Business Enterprise Programs*, 17 Geo. Mason U. Civ. Rts. L.J. 423, 436 (2007).[6] Minority firms, which may bid less frequently or do not have the capacity to bid on major federal projects, cannot be compared to larger, more sophisticated firms that might not be owned by minorities. *Eng'g Contractors*, 122 F.3d at 917 (County's own expert admitted that "firm size plays a significant role in determining which firms win contracts").

In sum, Defendants' reports recount a variety of statistical disparities among different groups in different places. But, as Judge Thapar wrote, "[s]tatistical disparities don't cut it." *Vitolo*, 999 F.3d at 361 (*citing Croson*, 488 U.S. at 503). As Wainwright testified before, "the existence of a disparity doesn't mean that it is related to discrimination." *Eng'g Contractors,* 943 F.

---

[6] In this article, LaNoue recounts a contractor in a federal case who testified: "[c]ompanies that bid seldom generally [work on] the types of projects we don't do a lot of. We infrequently have a project in that area so there isn't a lot of call for them to bid. There are also some contractors that just choose not to bid in our arena. They prefer to court other markets, local markets, private work, instead of coming into the state contracting area of work."

Supp. at 1573. The compelling-interest test requires proof of *intentional* discrimination by a bad actor. Defendants' reports and experts do not identify the perpetrator of this alleged intentional discrimination based on statistical modeling. "The [*Croson*] Court did not even suggest, however, that evidence of statistical disparities would be sufficient to support an affirmative action program where, as here, the identity of the wrongdoers is unknown." *Phillips & Jordan, Inc. v. Watts*, 13 F. Supp. 2d 1308, 1313 (N.D. Fla. 1998).

    3. **Federal Government Participation in Discrimination.** Even assuming Defendants proffered evidence of specific episodes of intentional discrimination and did not rely on broad statistical disparities, Defendants have proffered no evidence of federal government involvement in the intentional discrimination that it seeks to remedy. This is important because, in the absence of a constitutional violation, there can be no racial remedy. Indeed, the "remedy" becomes a violation.

    In a similar case involving the Florida Department of Transportation, the Northern District of Florida emphasized that there was no evidence that state actors were involved in the discrimination: "In this case, it is agreed that FDOT did not discriminate against minority contractors bidding on road maintenance contracts. The record is virtually silent, however, about who, if anyone, did discriminate." *Phillips & Jordan, Inc.*, 13 F. Supp. 2d at 1314. Emphatically, the court concluded: "The record at best establishes nothing

more than some ill-defined wrong caused by some unidentified wrongdoers; and, under [*Croson*], that is not enough!" *Id.* Here, Defendants similarly rely on an "ill-defined wrong caused by some unidentified wrongdoers." *Id.* This isn't enough to establish a compelling interest.

Moreover, government participation cannot mean "any governmental contracting in a marketplace where there is discrimination." *Webster v. Fulton Cnty., Ga.*, 51 F. Supp. 2d 1354, 1369 (N.D. Ga. 1999), aff'd, 218 F.3d 1267 (11th Cir. 2000). Despite a flurry of citations to previous courts upholding different preferences over the past decades, Defendants in this case do not identify how, exactly, the federal government participated in the discrimination they now hope to remedy.[7]

## B.    The Infrastructure Act's quota is not narrowly tailored.

Even assuming Defendants properly identified a past episode of intentional discrimination perpetrated by the federal government, the remedy—a nationwide quota automatically favoring certain racial groups over others—is not narrowly tailored.

---

[7] The true purpose of the quota is likely to advance the goals of the "Executive Order on Advancing Racial Equity," which Defendants cite enthusiastically in the Compelling Interest Report. Doc. 29-1:4–5. Racial equity (i.e. "racial balancing"), however, is not a compelling governmental interest. *See Parents Involved,* 551 U.S. at 705 ("Accepting racial balancing as a compelling state interest would justify imposing racial proportionality throughout American society, contrary to the Court's repeated admonitions that this is unconstitutional.").

A narrowly tailored remedy would be to punish the perpetrators of intentional race discrimination and then make the victims whole. The Supreme Court explained this: a governmental unit may act to fix discrimination "by taking appropriate measures *against those who discriminate*." *Croson*, 488 U.S. at 509 (emphasis added). The Eleventh Circuit echoed this race-neutral remedy: as "a first resort," a government must "ensure that its own operations are run on a strictly race-and ethnicity-neutral basis," by rooting out "discrimination by local contractors" and taking steps to "inform, educate, discipline, or penalize its own officials and employees responsible for the misconduct." *Eng'g Contractors*, 122 F.3d at 929. "If a race-neutral remedy is sufficient to cure a race-based problem, then a race-conscious remedy can never be narrowly tailored to that problem." *Id.* at 927.

Defendants do not even attempt this narrow remedy because they can't define the discrimination that they hope to fix, and they can't identify the victims they hope to help. Instead, Defendants rely on laughable racial categories and automatically grant a presumption of disadvantage to certain ethnicities but not others. *See* 49 C.F.R. § 26.67 (incorporating SBA definitions in 13 C.F.R. § 124.103). Consider this: a contractor who is an immigrant from Peshawar, Pakistan is automatically presumed disadvantaged and included in the $37 billion quota. Yet a contractor who immigrated from Jalalabad, Afghanistan—a mere 80 miles away—is presumed to be *not* disadvantaged.

17

The Jalalabad contractor is in the same boat as Christian Bruckner, the disabled contractor who immigrated from Romania, who is also presumed *not* disadvantaged. *See Vitolo*, 999 F.3d at 364 ("the Indian applicant will presumptively receive priority consideration over his Afghan friend. Why? Because of his ethnic heritage.") This is irrational and indefensible.

Defendants do not contend that *even a single study* explains why they must remedy past discrimination against Black, Hispanic, Native American, Asian Pacific, and Subcontinent Asian contractors, but not *other* contractors (or even other minority groups). Indeed, Defendants do not identify the reports or evidence that addresses recent and relevant discrimination against Native American, Asian Pacific, or Subcontinent Asian federal infrastructure contractors, even assuming such evidence exists. This lack of evidence alone should be fatal to the entire $37 billion quota. Defendants cite exactly zero cases justifying the arbitrary racial categories erected by the federal government and employed here in the Infrastructure Act—because those cases don't exist. No court has ever explained how, for example, the federal government may favor Columbians not but Brazilians, Somalis but not Egyptians, Chinese from Inner Mongolia but not Mongolians from Mongolia proper, and Indonesians but not those contractors who grew up just over the

border in East Timor.[8] In fact, *Croson* itself levels this salient question, which, after 50 years has never been answered by any government official: "If a 30% set-aside was 'narrowly tailored' to compensate black contractors for past discrimination, one may legitimately ask why they are forced to share this 'remedial relief' with an Aleut citizen who moves to Richmond tomorrow?" *Croson*, 488 U.S. at 506. Defendants have never had an answer to this question, and they still don't.

What's more, narrow tailoring requires racial classifications to be "limited in time." *E.g., Grutter v. Bollinger*, 539 U.S. 306, 342 (2003) (race remedies are "potentially so dangerous that they may be employed no more broadly than the interest demands.") Defendants admit—and in fact *emphasize*—that they have been doing this same thing for the better part of four decades. Doc. 29:1 ("nationwide transportation program that has been in effect since 1983"). So how is this remedy working? It isn't. The Compelling Interest Report says despite nearly identical racial quotas imposed by Congress over the previous decades, the "needle has not moved." Doc. 29-1:18. If the remedy isn't working, it can't be narrowly tailored. How could it?

---

[8] "For reasons never publicly expressed, the dividing line between 'Asians' and 'Whites' lies at the western border of Pakistan, and further north, China." David E. Bernstein, *Classified: The Untold Story of Racial Classification in America*, p. 19 (Bombardier Books, 2022) (explaining the irrational history of federal racial classifications, most of which are employed in the Infrastructure Act).

Instead of addressing the overbroad details of this remedy and its abysmal four-decade-long track record, Defendants instead argue the quota is narrowly tailored because it's only a *presumption* in favor of certain racial groups, and "presumptions are subject to challenge." Doc. 29:22. A white contractor, like Bruckner, can seek inclusion by "demonstrating social and economic disadvantage." *Id*. And Bruckner (or anyone else) can challenge someone *else's* presumption of social disadvantage by following a procedure in the CFR by proving they really are not disadvantaged. *See* 49 C.F.R. § 26.67(b). This is not narrow tailoring. The favored races get a presumption that "is dispositive." *Vitolo*, 999 F.3d at 363. And disfavored races, like whites and many Asians, must bear the "burden of demonstrating" "by a preponderance of the evidence" that they are disadvantaged. *See* 49 C.F.R. § 26.67(d). This is precisely backwards. Narrow tailoring would require individualized treatment for those who seek to be included in a race-based government benefit (for example, through demonstrating that they were the victims of a specific episode of intentional discrimination by the government),[9] with broad based exceptions to protect innocent parties, like Bruckner.

---

[9] Defendants and Congress recently demonstrated they know exactly how to do this. In the so-called "Inflation Reduction Act," Congress created a "Discrimination Financial Assistance Program," which provides assistance to farmers and ranchers who experienced intentional discrimination by "Department of Agriculture farm lending programs." Pub. L. No. 117-169, § 22007 (subsection (e), page 205).

The fact that members of some racial groups are presumed entitled to benefits while members of other groups must prove their worth is not to obviate discrimination; it embodies it. It does not save the program; it indicts it.

Defendants finally argue that this program is narrowly tailored because the quota "may be higher or lower than 10%." Doc. 29:24. This is not exactly true. The language of the act is mandatory ("shall be expended"), Doc. 1:¶15, and Defendants have confirmed their dedication to this quota ("will spend at least 10 percent"), Doc. 1:¶16, thereby making the quota mandatory in law and in practice. Nevertheless, Defendants do not claim that a different standard applies even if this program is merely a racially discriminatory "aspirational goal" versus a racially discriminatory "quota." Strict scrutiny applies in both situations. *See, e.g., NE Fl. Ch. of Assoc. Gen. Contractors v. City of Jacksonville, Fla.,* 508 U.S. 656, 661 (1993) (rejecting city's argument that changing from quotas to "participation goals" mooted challenge to ordinance); *Eng'g Contractors*, 122 F.3d 895 (applying strict scrutiny and permanently enjoining race-based "participation goals"). And no case holds that a government program of race discrimination is narrowly tailored because the quota may actually "be higher or lower" than the stated "goal."[10]

---

[10] For the reasons stated in Plaintiffs' principal brief, which is unrebutted, the Infrastructure Act's quota in favor of women does not meet intermediate scrutiny.

## II.   Plaintiffs Will Suffer Irreparable Harm if a Preliminary Injunction is not Granted.

Plaintiffs will suffer irreparable harm because Defendants' imposition of racial classifications is a harm to personal dignity. As the Supreme Court wrote, "as we have repeatedly emphasized, discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984).

Defendants argue that irreparable harm cannot be presumed, citing *Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) and other cases. The federal government made nearly identical arguments in *Wynn v. Vilsack*, which this Court specifically considered and rejected. 545 F. Supp. 3d 1271, 1291 (M.D. Fla. 2021). Plaintiffs, like the plaintiffs in *Wynn*, cannot obtain monetary damages. *Id.* Without an injunction, therefore, Plaintiffs will suffer a "constitutional harm…which cannot be undone by money damages and for which no other remedy exists." *Id.* at 1292; *see also Thompson Bldg. Wrecking*

---

Just like in *Vitolo*, all women-owned businesses are deemed disadvantaged. *Vitolo*, 999 F.3d at 365. Defendants do not explain why a women-owned business experiencing no economic disadvantage should be counted among those benefitting from this broad set aside. *Id.*

*Co., Inc. v. Augusta, Ga.*, No. 107CV019, 2007 WL 926153, at *9 (S.D. Ga. Mar. 14, 2007) (granting preliminary injunction against Augusta, Ga., affirmative action plan,); *see also O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 428 (D.C. Cir. 1992) (recognizing that "the difficulty of such an inherently speculative showing weighs heavily in favor of granting [an] injunction.")

## III.   The Public Interest and Balance of Harms Favors an Injunction.

According to the Eleventh Circuit, "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). And the balance of equities certainly favors Plaintiffs. On the one hand, Plaintiffs and all others similarly situated who are qualified, willing, and able to bid on government contracts will have fewer opportunities under this unconstitutional policy. Every contract under this policy imposes dignitary harm and sends the message that government-sanctioned race discrimination is not only acceptable, but laudable. On the other hand, there is no value in an unconstitutional policy, particularly one that the government apparently concedes is a failed one. Despite decades of repeating the same justifications for the same type of set-aside program, "the needle has not moved."

In response, Defendants make the same arguments that federal defendants made in *Wynn*. And again, this Court dispensed with those

arguments cogently: "If the statute in fact violates the Constitution, the Government does not have a legitimate interest in its implementation regardless of whether it was passed through the democratic process." *Wynn*, 545 F. Supp. 3d at 1293.

## IV.   Plaintiffs Have Standing Because Defendants Discriminate Against Them Based on Race and Gender.

Defendants also attempt to undercut Bruckner's standing to sue by claiming that he has not suffered an injury in fact. But this argument is rebutted by Supreme Court precedent. Unequal consideration—not unequal results—is the hallmark of an equal protection claim of this kind: "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *NE Fla.*, 508 U.S. at 666. "And in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Id.*

Defendants cite *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1271 (11th Cir. 2000) for the proposition that the plaintiff must suffer an invasion of a legally protected interest that is "concrete and particularized and actual or imminent." This is true as far as it goes, but this statement, quoted in dissent

in an election law dispute, does not overrule the Supreme Court's holding in *Northeastern Florida* that a contractor suffers such a harm for standing purposes when he or she is denied the opportunity to compete on equal footing. The remaining cases Defendants cite for this proposition fare no better. In *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), the plaintiffs (all United States citizens or organizations) had no evidence to suggest that the law would ever be applied to them. The same is not true here.

Where "a discriminatory policy prevents [him] from doing so on an equal footing," a plaintiff like Bruckner has standing. *Webster*, 51 F. Supp. 2d at 1362. As the Supreme Court has long recognized, Bruckner is not required to put himself through a discriminatory process in order to make his claim. The prohibition on race discrimination applies just as much to the black applicant who walks away upon seeing a "whites only" sign as it does to the Hispanic applicant who applies and is rejected. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977).

## V.      Plaintiffs' Claims Are Ripe.

Additionally, Defendants contend that Bruckner's claim is not ripe because he has not submitted a bid on a particular DOT project. At the same time, Defendants argue that contract bids are being submitted and road and transit projects are being built pursuant to the Infrastructure Act. If this argument seems self-contradicting, it is. And like Defendants' injury-in-fact

25

argument, it also ignores the nature of the harm that Bruckner and other qualified contractors like him incur every time such projects are let.

Defendants cite *Texas v. United States* for the proposition that claims are unripe if they rest upon contingent future events that may not occur as anticipated. 523 U.S. 296 (1998). In *Texas*, the state enacted a law that permitted the state to sanction school districts that failed to meet state achievement standards in any one of ten different ways, one of which was to appoint a master to oversee the district's operations. Texas challenged that particular provision as a potential problem under the Voting Rights Act, but the Supreme Court unanimously dismissed the case on ripeness grounds because the state could not point to a district that had fallen below state standards and had been assessed the sanction. *Id.* This isn't the case here, where the harm to Plaintiffs occurs each time a contract is offered.

Further, Defendants incorrectly argue that the factors outlined in *Pittman v. Cole*, 267 F.3d 1269 (11th Cir. 2001) weigh against Plaintiffs. The three factors are whether delayed review would cause harm to the plaintiff, whether judicial intervention would interfere with further administrative action, and whether the courts would benefit from further factual development. *Id.* at 1278. All three factors come down in Plaintiffs' favor. First, as already discussed, each time a contract for which Plaintiffs are qualified is awarded based on race, Plaintiffs suffers a dignitary harm that harm is irreparable.

Judicial intervention would not interfere with further administrative action either—once again, Plaintiffs seek an injunction and declaration that the entire bidding framework illegally takes race into account. The question is purely a matter of law based on undisputed facts, which weighs against Defendants on both the second and the third factor. There need be no further fact finding because the particulars of the project at issue do not matter. What matters is that Plaintiffs are qualified to bid on certain of the contracts funded by the Infrastructure Act and Bruckner's race prohibits him from doing so on equal footing. The claim is ripe any time that these contracts are let, a practice that Defendants explicitly acknowledge is currently occurring.

## VI.   This Court Should Issue a Nationwide Injunction.

Plaintiffs challenge a federal law that discriminates based on race. If this Court concludes that this federal law is invalid—in other words, that the Infrastructure Act unconstitutionally discriminates against potential government contractors based on race and gender—then it should enjoin Defendants from applying the law. A federal district court may issue a nationwide, or "universal," injunction, *see Trump v. Hawaii*, —— U.S. ——, 138 S. Ct. 2392, 2425 n.1, 201 L.Ed.2d 775 (2018) (Thomas, J., concurring) when "necessary to offer full relief to the plaintiffs." *Georgia v. President of the United States,* 46 F.4th __, 2022 WL 3703822 (11th Cir. 2022).

Here, Defendants oppose a nationwide injunction, but do not explain how an injunction applying only to Plaintiffs would protect Plaintiffs. According to the Verified Complaint, Plaintiffs are qualified, willing, and able to bid on projects under the Infrastructure Act. Doc. 1:¶¶6,7, 35. Plaintiffs have not yet decided on what contracts they will bid, or in what cities or states. As Defendants explain, the funding so far has been dispersed through all 50 states and to more than 700 local government agencies. Doc. 29-4:¶7; Doc. 29-5:¶7. The quota is top-down: ordered by Defendants and implemented at a local level by officials throughout the United States.

Plaintiffs may bid on contracts funded by the Infrastructure Act through a variety of local authorities, cities, counties, states, or federal agencies. Doc. 1:¶¶6, 7, 35. Obviously, when Plaintiffs bid on a contract, they will have to honestly answer questions concerning race and gender (they can't lie about Bruckner's race). Then, local government officials reviewing the contracts will then process the bid based on those answers, ascribing a race-or-gender preference based on applicable preferences. Limiting an injunction to Plaintiffs only would create an unworkable situation in which Plaintiffs must notify every non-party government official of the existence of an injunction in this case, and then hope that those non-party government officials will honor the injunction. They may not (because they are not parties).

The harm here is caused from the top-down by Defendants' policy, which they impose upon local contracting officials. The only way to prevent the Infrastructure Act's unconstitutional quota is to enjoin the federal officials responsible for implementing that quota (namely, Defendants), who will then prevent lower officials from discriminating against Plaintiffs (and others). A top-down remedy is the only workable remedy because any other limited remedy would place an unworkable burden on Plaintiffs to inform non-party government officials of the injunction and hope they will comply.

This Court came to the same conclusion in *Wynn*, when it wrote, "the Court can envision no other remedy that will prevent the likely violation of Plaintiff's constitutional right which absent an injunction cannot be remedied in this action." *Wynn*, 545 F. Supp. 3d at 1295. Plaintiffs similarly can envision no other remedy to protect their interests other than to declare the quota a "nullity and order that its benefits not extend to the class that the legislature intended to benefit." *Welsh v. United States*, 398 U.S. 333, 361 (1970) (Harlan, J., concurring in result).

Especially in the context of race discrimination, an appropriate remedy is to strike down the policy or law at issue. For example, the Supreme Court didn't merely grant relief to Allan Bakke—it struck down the policy, which also gave relief to non-plaintiffs. *See Regents of Univ. of California v. Bakke*, 438 U.S. 265, 270 (1978) (striking down entire admission policy, not simply as

29

applied to the plaintiff). And the Court didn't not merely award relief to parents who were members of the group "Parents Involved in Community Schools." *Parents Involved*, 551 U.S. 701 (2007) (invalidating entire policy, without regard to who benefited from the decision). Finally, when the Southern District of Florida permanently enjoined Dade County's "Black, Hispanic, and Women Business Enterprise Programs," it did not limit relief only to the six trade associations who were plaintiffs. *Eng'g Contractor*s, 943 F. Supp. at 1551, 1584–85 An injunction prohibiting Defendants from implementing the nationwide quota is the only option likely to give relief to Plaintiffs.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction.

Dated: September 28, 2022

<div style="margin-left:40%">

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*/s/ Daniel P. Lennington*

Richard M. Esenberg
Daniel P. Lennington
Kate M. Spitz
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Dan@will-law.org

</div>

ABEL BEAN LAW P.A.
Daniel K. Bean
Jared J. Burns
100 N. Laura Street, Suite 501
Jacksonville, FL 32202
Telephone: (904) 944-4100
dbean@abelbeanlaw.com
jburns@abelbeanlaw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on September 28, 2022, I electronically filed a copy of the foregoing document with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all counsel of record.

/s/ *Daniel P. Lennington*