UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHRISTIAN BRUCKER, and
PROJECT MANAGEMENT CORP.,

       Plaintiffs,

v.                                         Case No. 8:22-cv-1582-KKM-SPF

JOSEPH R. BIDEN, JR., MITCHELL J.
LANDRIEU, and PETER P. BUTTIGIEG,

       Defendants.

_____

## ORDER

At its core, the Equal Protection Clause prohibits the States from treating citizens differently based on race. The Fifth Amendment's "equal protection component" similarly proscribes racial discrimination by the federal government. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 204, 217 (1995). And for good reason: Racial discrimination undermines the human dignity of the individual, tarnishes the integrity of the government, and defies the "self-evident" truth that inspired our Republic. *See* THE DECLARATION OF INDEPENDENCE ¶ 2 (U.S. 1776) ("[A]ll men are created equal[.]"). One would hope then

1

that the federal government would abstain from discriminating based on race. Unfortunately, it has not, which leads to this action.

Christian Bruckner and his company, Project Management Corporation (PMC), allege that they cannot compete equally for certain Department of Transportation-funded contracts because the federal government disfavors Bruckner's race and sex. *See* Compl. (Doc. 1). The Plaintiffs sue President Biden, Infrastructure Implementation Coordinator Mitchell Landrieu, and Secretary of Transportation Peter Buttigieg, and move for a nationwide preliminary injunction, alleging that § 11101(e)(3) of the Infrastructure Act unconstitutionally infringes their Fifth Amendment rights. *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 11101(e)(3), 135 Stat. 429, 449 (2021). The Defendants admit that the Infrastructure Act countenances race and gender discrimination but defend that authorization as a permissible remedial measure. They, in turn, move to dismiss the complaint for lack of standing and ripeness, and for failure to state a claim.

Although the Plaintiffs raise compelling merits arguments based on the preliminary-injunction-stage record, they fail to demonstrate an injury-in-fact to satisfy Article III standing. Some recipients of the Infrastructure Act's funds do not employ race- and gender-conscious means when awarding contracts. Others employ discriminatory means only with respect to some contracts. Because the Plaintiffs do not identify which contracts they intend to bid on, the Plaintiffs' alleged harm is speculative and they fail to

allege facts demonstrating a "certainly impending" "direct exposure to unequal treatment." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotations and emphasis omitted); *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1280 (11th Cir. 2001). Without subject-matter jurisdiction, I deny the motion for a preliminary injunction and dismiss the case without prejudice.

## I.   BACKGROUND

### A. The Infrastructure Act

President Biden signed the Infrastructure Act—a $1.2 trillion spending bill—on November 15, 2021. Compl. ¶ 1. Among other things, the Infrastructure Act apportions funding for state and local highway and surface transportation contracts. *See generally* 135 Stat. 429. For example, the Infrastructure Act allocates $273 billion for the Federal-Aid Highway Program, which funds state-sponsored highway projects, *id.* at §11101(a)(1), and $70 billion for public transit grant programs, which fund state departments of transportation and state and local transit agencies. *Id.* at § 30017(a); *see also* Defs.' Ex. McCallum's First Decl. (Doc. 29-4) ¶ 6; Defs.' Ex. Kenley's First Decl. (Doc 29-5) ¶ 6.

The Infrastructure Act—through the Act's Disadvantaged Business Enterprises (DBE) Program—requires state and local recipients to set overall "goals" for the participation of "socially and economically disadvantaged" small business owners on public contracts. § 11101(e)(3), 135 Stat. at 449; 49 C.F.R. §§ 26.41, 26.45. "[S]ocially

3

disadvantaged individuals" are "those who have been subjected to racial or ethnic prejudice or cultural bias within American society . . ." 49 C.F.R. § 26 app. E. "Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired . . . as compared to others in the same . . . line of business who are not socially disadvantaged." *Id.* Some groups fare better than others though, as a matter of presumption: Women "shall be presumed to be socially and economically disadvantaged individuals," § 11101(e)(2)(B), 135 Stat. at 449, and Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and Subcontinent Asian Americans are presumptively socially and economically disadvantaged, 49 C.F.R. § 26.67(a)(1). Men, Caucasian Americans, and minorities from Central Asia, the Middle East, North Africa, and non-Hispanic South American countries do not enjoy the same presumption. *See* 49 C.F.R. § 26.67(a)(1). Members of those disfavored groups may nonetheless apply for classification as socially and economically disadvantaged, but they bear the burden of proving past prejudice or bias and lack of economic liquidity. 49 C.F.R. § 26.67(d).

The Infrastructure Act requires that, "except to the extent the Secretary [of Transportation] determines otherwise," "not less than" ten percent of federal funding for surface transportation and public transit projects "shall be expended" on contracts awarded to businesses "owned and controlled by socially and economically disadvantaged

individuals." § 11101(e)(3), 135 Stat. at 449; Division A, 135 Stat. at 443–651; Division C, 135 Stat. at 889–922; § 24101(a)(2), 135 Stat. at 783. Per regulation, 49 C.F.R. § 26.41(b), that national goal is "aspirational."[1] To achieve that national goal, each recipient must set an overall DBE goal "based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on" contracts that the recipient oversees. 49 C.F.R. § 26.45(a)–(b). The recipients are not required "to set overall or contract goals at the 10 percent level, or any other particular level, or to take any special administrative steps if their goals are above or below 10 percent." *Id.* § 26.41(c). The recipient may adjust the participation goal "to account for the continuing effects of past discrimination . . . or the effects of an ongoing DBE program" and that adjustment "must be based on demonstrable evidence that is logically and directly related to the effect for which the adjustment is sought." *Id.* § 26.45(c)(3); (d)(1)–(3). In sum, the DBE Program purports to remedy past intentional discrimination based on race and gender in the transportation industry. *See, e.g., W. States*

---

[1] It is hard to imagine how the ten-percent goal is only "aspirational," given the statute's clear language, *see* § 11101(e)(3), 135 Stat. at 449 ("shall be expended"), and the Biden Administration's express commitment to at least ten percent, *see* Press Release, The White House, *FACT SHEET: The Bipartisan Infrastructure Law Will Revitalize Main Street* (Nov. 23, 2021), at https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/23/fact-sheet-the-bipartisan-infrastructure-law-will-revitalize-main-street/ ("Specifically, the Federal Highway Administration, Federal Transit Administration, and National Highway Traffic Safety Administration will seek to expend at least 10 percent of their more than $370 billion in contract authority through small disadvantaged businesses.").

*Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 991–93 (9th Cir. 2005) (holding that the DBE program serves the compelling interest of correcting and preventing discrimination in the "transportation contracting industry").

A recipient of these DOT funds "must meet the maximum feasible portion of [its] overall [DBE] goal by using race-neutral means" and may resort to race-conscious means only if it cannot reach its goal otherwise. 49 C.F.R. § 26.51. For instance, the Florida Department of Transportation uses exclusively race-neutral means while awarding contracts funded by the Federal Aid Highway Program. Defs.' Ex. Kenley's First Decl. ¶ 13. Likewise, of the thirty-one local recipients in Florida that use federal aid for public transit, twenty-two use exclusively race-neutral means when awarding contracts. Defs.' Ex. McCallum's First Decl. ¶ 12. A few localities also set their DBE participation goals at zero percent for all contracts awarded under the Infrastructure Act. Defs.' Ex. McCallum's Second Decl. (Doc. 48-1) ¶ 8. Because there is no DBE participation goal for those recipients, they do not employ discriminatory sorting in awarding contracts. *See id.*

Furthermore, recipients that utilize race-conscious means sometimes also offer contracts that do not have a DBE goal. Prelim. Inj. Hr'g Tr. at 34:21–25. In other words, a DOT-funding recipient might achieve its overall DBE goal without employing race-conscious means to award some of its contracts. *See id.*; 49 C.F.R. § 26.51(e)(2). And if a recipient employs race-conscious means, the recipient "may use contract goals only on those

DOT-assisted contracts that have subcontracting possibilities." 49 C.F.R. § 26.51(e)(1)–(2). In those circumstances, the race and gender presumptions inherent in the DBE program inure to the benefit of only DBE subcontractors, not prime contractors. *See id.*; Defs.' Ex. Kenley's Second Decl. (Doc. 48-2) ¶ 6. According to Defendants, subcontractors—before bidding on a particular contract—know whether the prime contractor or recipient will employ race- and gender-conscious means to award the work because the contract announcement includes that information. Defs.' Suppl. Br. (Doc. 48) at 9.

Thus, in some instances, a recipient never uses discriminatory means to award contracts, despite having a DBE goal above zero. In other instances, a recipient might selectively use discriminatory means on certain contracts to meet its overall DBE goal when race- and gender-neutral means will not suffice. At bottom, that variation means a subcontractor might not suffer unequal treatment on account of his race and gender, depending upon which contract he bids on.

**B. The Plaintiffs**

Christian Bruckner is a disabled immigrant who lives and works in a historically underutilized section of Tampa, Florida. Compl. ¶¶ 2, 6. He is also a white male. *Id.* ¶ 6. Because of Bruckner's race and sex, Bruckner and Project Management Corporation

(PMC) do not benefit from the presumption of social and economic disadvantage—a presumption useful for attaining DBE status.

The Plaintiffs allege that "Bruckner has over 20 years of experience in government contracting and is qualified, willing, and able to be a contractor and subcontractor under the Infrastructure Act." *Id.* Further, "PMC currently fulfills and bids on federal contracts," and "PMC can fulfill transportation and infrastructure-related contracts, including those contracts available under the Infrastructure Act." *Id.* ¶ 7. The Plaintiffs never identify the specific services that PMC offers, indicate the scale of federal projects that PMC handles, or delineate the geographic scope where PMC can satisfy contracts. Nor do the Plaintiffs allege which Infrastructure Act-funded contracts they intend to bid on or have bid on in the past. Indeed, they affirmatively disavow having decided where they will bid, other than to allege that they plan to pursue "transportation and infrastructure-related contracts." Compl. ¶ 7; Pls.' Reply Supp. Am. Mot. for Prelim. Inj. (Doc. 32) at 28 ("Plaintiffs have not yet decided on what contracts they will bid, or in what cities or states.").

Bruckner and PMC sue President Biden, Infrastructure Implementation Coordinator Mitchell Landrieu, and Secretary of Transportation Peter Buttigieg in their official capacities, alleging that the Act violates their rights under the equal protection component of the Fifth Amendment. *See* Compl. The Plaintiffs move for a preliminary

injunction, Am. Mot. for Prelim. Inj. (Doc. 17), and the Defendants move to dismiss. Mot. to Dismiss (Doc. 31).

## II.   LEGAL STANDARD

Article III, § 2 vests federal courts with the power to decide "Cases" and "Controversies," not "questions and issues." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011). "The doctrine of standing implements this requirement," ensuring that a case embodies "a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020).

To establish standing, a plaintiff must "(1) suffer[] an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). These elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). As such, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Id.*; *see also* *Spokeo*, 578 U.S. at 338; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). At the pleading stage, a plaintiff can satisfy his burden by "'clearly alleg[ing]' facts demonstrating' each element." *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

If a plaintiff sues for prospective relief, he must allege a harm that is "certainly impending." *Clapper*, 568 U.S. at 409. The plaintiff must demonstrate that he is "immediately in danger" of sustaining an injury "as the result of the challenged official conduct." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (quotation omitted). The "threat of injury" may not be " 'conjectural' or 'hypothetical,' " *id.*, and allegations of a possible future injury are insufficient. *Clapper*, 568 U.S. at 409; *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328–29 (11th Cir. 2013).

When the government denies equal protection, the plaintiff's injury in fact "is the denial of equal treatment resulting" from the government-imposed "barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Stated differently, "the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Id.* A plaintiff need not allege that, but for the barrier, he would have obtained the benefit. But a plaintiff must allege that he will experience "direct exposure to unequal treatment." *Wooden*, 247 F.3d at 1280. If a plaintiff seeks prospective relief to remedy an equal-protection injury, he must allege that he is "immediately in danger" of "actually be[ing] treated differently" based on a protected class. *Lyons*, 461 U.S. at 101–02; *Wooden*, 247 F.3d at 1278.

## III. ANALYSIS

The Plaintiffs fail to allege facts showing that they are "able and ready" to bid on Infrastructure Act-funded contracts. They also fail to allege facts demonstrating that they will necessarily be denied equal treatment based on Bruckner's race and gender if and when they bid. They therefore have not alleged an injury in fact.

### A. The Plaintiffs fail to allege facts showing that they are "able and ready" to bid on DOT-funded contracts available under the Infrastructure Act.

The Plaintiffs make broad allegations: Bruckner is "qualified, willing, and able to be a contractor and subcontractor under the Infrastructure Act" and "PMC can fulfill transportation and infrastructure-related contracts, including those contracts available under the Infrastructure Act." Compl. at ¶¶ 6–7, 35. By this, Bruckner and PMC mean that they consider themselves able and ready to bid on contracts in all fifty States. Pls.' Reply Supp. Am. Mot. for Prelim. Inj. at 28 (citing Compl. at ¶¶ 6–7, 35). Taking the Plaintiffs at their word, their allegations equate to being able and ready to bid on contracts provided by nearly eight-hundred States and localities spanning the country and involving services as divergent as road resurfacing and public transit projects. *See* Defs.' Ex. McCallum's First Decl. at ¶ 7; Defs.' Ex. Kenley's First Decl. at ¶ 7. But a "bare statement of intent," without more, is insufficient to confer standing. *Adams*, 141 S. Ct. at 502. Instead, a plaintiff must "clearly" "allege facts demonstrating" that he is "able and ready" to

bid on contracts under a discriminatory scheme. *Spokeo*, 578 U.S. at 338 (quotation omitted); *Northeastern Florida*, 508 U.S. at 666. Without alleging facts showing that the Plaintiffs are able and ready to bid on the vast array of contracts funded through the Infrastructure Act, their harm is neither actual nor "certainly impending." *Northeastern Florida*, 508 U.S. at 666 & n.5; *Clapper*, 568 U.S. at 409.

Start with *ability* to bid on these contracts. The complaint contains no allegations regarding Bruckner's expertise, Bruckner's prior experience, PMC's practical capabilities as a company, or any detail regarding the kinds of contracts that the Plaintiffs would like to pursue under the Infrastructure Act. In fact, the Plaintiffs admit that they "have not yet decided on what contracts they will bid" if they prevail. Pls.' Reply Supp. Am. Mot. for Prelim. Inj. at 28. Further, the Plaintiffs claim that they do not know where they will bid on contracts and suggest that they may bid on contracts in any of the fifty States. *Id.* Without additional factual allegations, it is implausible that a company that regularly services an underprivileged area in Tampa has the capability to bid on *any* kind of contract funded by the Infrastructure Act in *any* State or locality across the nation. It is also unlikely that such a company would satisfy many of the local recipients' qualifications to bid, such as municipal permitting or the like.

Although the complaint also states that PMC is "able" because it "currently fulfills and bids on *federal* contracts," Compl. at ¶ 7 (emphasis added), the complaint never alleges

that PMC has ever fulfilled the kinds of contracts awarded under the Infrastructure Act and governed by the DBE program. Those contracts relate to surface transportation and public transit, *see* § 11101(e)(3), 135 Stat. at 449; Division A, 135 Stat. at 443–651; Division C, 135 Stat. at 889–922; § 24101(a)(2), 135 Stat. at 783, yet it is unclear if PMC engages in that kind of work or has ever bid on similar contracts before. Further, the challenged DBE Program under § 11101(e)(3) of the Infrastructure Act governs funds awarded to state and local governments, not federal agencies.[2] Thus, PMC's experience in federal contracting alone does not demonstrate that PMC is able to bid on contracts administered by States and local municipalities and governed by § 11101(e)(3).

---

[2] The Plaintiffs claim that the DBE program sometimes governs the bidding process for direct contracting with the federal government. Pls.' Suppl. Br. (Doc. 47) at 1. They note that, by its terms, § 11101(e)(3) applies to all funds appropriated under Division A of the Infrastructure Act, 135 Stat. at 449, and Division A includes appropriations for federal programs. *See e.g.*, §§ 11101(a)(3), 11112, 1113, 11305. But the Defendants explain why the Plaintiffs misread the statute. Defs.' Suppl. Br. (Doc. 48) at 2–3. The Secretary of Transportation interprets § 11101(e)(3) to authorize the Secretary to limit the application of the DBE program to federal agencies. (*Id.* at 3 n.10.) And accompanying regulations clarify that the Act only applies to programs involving funds awarded to non-federal recipients. 49 C.F.R. § 26.3; *see also* Defs.' Ex. McCallum's First Decl. at ¶ 7 (explaining that public transit funding is awarded to State and local recipients); Defs.' Ex. Kenley's First Decl. at ¶¶ 3, 7 (explaining that the Federal-aid Highway Program awards funds to state and local governments). Moreover, the Infrastructure Act's DBE program is a continuation of a prior DBE program, § 11101(e)(1)(E), 135 Stat. at 449, and the Supreme Court opined that the prior program only applies to States and localities. *See Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 106–08 (2001) (per curiam) ("[W]hile procurement by States and localities is governed by the regulations issued by the Secretary of Transportation under [the Transportation Equity Act for the 21st Century], direct federal procurement is governed by the Small Business Act . . .").

13

Turn next to *readiness* to bid. The complaint lacks factual allegations of past bidding by PMC or factual allegations demonstrating a desire to bid if discriminatory barriers did not exist. In cases involving challenges to discriminatory programs, plaintiffs demonstrating an injury in fact have alleged that they could not compete equally for an identified set of contracts in a particular location. They also alleged that they had bid in the past or would bid in the future on an identified set of contracts. *See, e.g., Cache Valley Elec. v. State of Ut. Dept. of Transp.*, 149 F.3d 1119, 1122 (10th Cir. 1998) (concluding that plaintiff's injury was imminent because the plaintiff identified the two contracts it lost because of the DBE program and alleged "it will continue to apply for UDOT electrical subcontracts in the relatively near future"); *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 940–41 (7th Cir. 2016); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 967 (8th Cir. 2003); *W. States Paving Co.*, 407 F.3d at 987. For example, in *Northeastern Florida*, the plaintiff alleged that "many of its members 'regularly bid on and perform construction work for the City of Jacksonville,' and that they 'would have . . . bid on . . . designated set aside contracts but for the restrictions imposed' by the ordinance." 508 U.S. at 659 (alterations in original) (internal citations omitted). Likewise, in *Adarand Constructors v. Pena*, the plaintiff (a subcontractor) established standing by showing that it "bids on every guardrail project in Colorado," the defendant is likely to award contracts "involving guardrail work . . . at least once per year in Colorado," and that

14

the plaintiff "is very likely to bid on each such contract." 515 U.S. at 212; *see also Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (holding that the plaintiff had standing because he "demonstrated" that he was able and ready to apply to the University of Michigan "as a transfer student should the University cease to use race in undergraduate admissions"); *Wooden*, 247 F.3d at 1279–80 (holding that a plaintiff had standing because she was "exposed to unequal treatment" at the second stage of the University of Georgia's admissions process).

Compare the above successful allegations with the plaintiff in *Adams*. He failed to prove that he was "ready" to apply for a judgeship in Delaware because he "relied on a bare statement of intent alone" and "against the context of a record that shows nothing more than an abstract generalized grievance." 141 S. Ct. at 501. Adams had never before applied for a judgeship, presented no evidence of prior conversations showing a desire to do so or efforts to determine likely judicial openings, and never made other preparations to apply. *Id.* His behavior, instead, inferred an attempt to remedy an "abstract, generalized grievance"—he changed his party affiliation that disqualified him from judicial selection immediately after reading a law review article that highlighted the purported constitutional violation and then swiftly sued. *Id.* The Supreme Court held that the context undermined Adams's "bare statement of intent." *Id.* at 502.

The Plaintiffs' allegations here are similar to Adams's. Without providing any detail about their prior experience with Infrastructure Act-funded contracts or preparations to apply for such contracts in the future, the Plaintiffs' assertions that they are ready to bid on contracts governed by the DBE program are conclusory.

In cases with injuries based on unequal treatment, plaintiffs have introduced "at least some evidence that, *e.g.*, they had applied in the past, there were regular opportunities available with relevant frequency, and they were 'able and ready' to apply for them." *Adams*, 141 S. Ct. at 502–03. To be sure, Bruckner and PMC need not present evidence at the pleading stage, but they must at least "clearly" "allege facts demonstrating" that they are "able and ready" to apply for contracts infected with discriminatory metrics. *Spokeo*, 578 U.S. at 338. They have not.

**B. The Plaintiffs fail to allege facts showing that they will actually experience unequal treatment if they bid.**

When the government denies equal protection, the plaintiff's injury in fact "is the denial of equal treatment." *Northeastern Florida*, 508 U.S. at 666. A plaintiff's "injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Id.* But a plaintiff must allege that he will experience "direct exposure to unequal treatment." *Wooden*, 247 F.3d at 1280.

16

Bruckner and PMC do not allege facts demonstrating that they will encounter unequal treatment when bidding on all DOT-funded contracts available under the Infrastructure Act. Nor could they, because not all recipients of Infrastructure Act funds employ discriminatory means to meet their DBE participation goals. Even those recipients that use race- and gender-conscious means do not always use them in every contract. The Plaintiffs' entire theory of standing is premised on the notion that the Infrastructure Act requires race and gender discrimination in all DOT-funded contracts. In their view, it does not matter which contract they bid on because all Infrastructure Act contracts are infected with racial and gender discrimination. That is legally and factually inaccurate.

States and localities do not award *all* Infrastructure Act contracts on a discriminatory basis. As a matter of law (even if not practice), the opposite is supposed to be true. Under 49 C.F.R. § 26.51, recipients must award contracts on a race–neutral basis to the maximum extent possible. Consider the State of Florida, which uses exclusively race-neutral means while awarding contracts funded by the Federal Aid Highway Program. Defs.' Ex. Kenley's First Decl. at ¶ 13. Additionally, of the thirty-one recipients in Florida that receive federal aid for public transit, twenty-two use exclusively race-neutral means. Other jurisdictions do not set DBE goals on certain projects, allowing recipients to award contracts without regard to the contractor's race or gender. Lastly, a few localities set their DBE participation

goals at zero percent for all contracts awarded under the Infrastructure Act. Defs.' Ex.
McCallum's Second Decl. at ¶ 8.

To be clear, it is *possible* that one of the contracts that the Plaintiffs would bid on
employs discriminatory means. It might even be statistically more likely than not (although
the Plaintiffs do not document how many of the over eight-hundred recipients use
discriminatory means and, of the subset that does discriminate, how frequently they do so).
As should be obvious by now, all this is guesswork. And the mere possibility of a
discriminatory barrier is insufficient. *Id.* at 1278–81; *Clapper*, 568 U.S. at 409 (quotation
omitted) ("[A]llegations of possible future injury are not sufficient."); *Lyons*, 461 U.S. at
101–02 (quotation omitted) ("The plaintiff must show that he 'has sustained or is
immediately in danger of sustaining some direct injury' as the result of the challenged
official conduct and the injury or threat of injury must be both 'real and immediate,' not
'conjectural' or 'hypothetical.' ").

The Eleventh Circuit's decision in *Wooden* exemplifies the Plaintiffs' problem.
There, several plaintiffs challenged the University of Georgia's affirmative action program.
247 F.3d at 1264. During the admissions process, UGA evaluated applications in three
stages and race was only a factor in the second stage of the evaluation. *Id.* at 1278–79.
*Wooden* held that a plaintiff who was eliminated at the first stage did not have standing
because, "at the only stage during which [the plaintiff's] application was considered by

18

UGA, she was plainly on an equal footing with all other applicants, and was deemed unqualified according to entirely race-neutral criteria." *Id.* at 1282. Comparatively, another plaintiff, who UGA rejected at the second stage, had standing because that plaintiff was "exposed to unequal treatment." *Id.* at 1279. In other words, plaintiffs who were ready and able to participate in the second stage had standing because they were directly "exposed" to a discriminatory barrier. Comparatively, plaintiffs who might potentially—but did not actually—suffer exposure to unequal treatment did not have standing.

In this case, because States and localities sometimes award contracts without considering the contractor's race or gender, the Plaintiffs fail to allege an injury in fact. To be sure—contrary to Defendants' arguments—the Plaintiffs need not allege that they applied for a government contract and were denied the contract on account of Bruckner's race or sex. *See Northeastern Florida.*, 508 U.S. at 666. But as the Plaintiffs acknowledged at the preliminary injunction hearing, a party does not suffer an injury if he is only ready and able to bid on contracts that do not use discriminatory means. *See Wooden*, 247 F.3d at 1282. And because the Plaintiffs fail to demonstrate that they are ready and able to bid on an identified contract, or set of contracts, that use discriminatory means, they only allege the possibility of future harm, not an actual or imminent one. That will not suffice for purposes of Article III standing. *See, e.g., Clapper*, 568 U.S. at 409; *Lyons*, 461 U.S. at 101–02; *Wooden*, 247 F.3d at 1278–83; *Houston*, 733 F.3d at 1328–29.

Bruckner and PMC claim to "challenge[] a single sentence in federal law: Section 11101(e)(3) of the Infrastructure [Act.]" Pls.' Suppl. Br. at 1.  They, in turn, believe that their "requested remedy is therefore narrow and precise: an injunction preventing Defendants from enforcing and implementing this one sentence." *Id.*  They are mistaken though about the complexity of when and how discrimination occurs under that sentence. Section 11101(e)(3) is implemented through a slew of regulations issued by the federal government. And many state and local recipients impose their own discriminatory sorting processes.[3] Sometimes, contracts are awarded under § 11101(e)(3) on a discriminatory basis; at other times, recipients use exclusively neutral means. Defs.' Ex. McCallum's First Decl.; Defs.' Ex. Kenley's First Decl. By refusing to identify which contracts that discriminate based on race and gender that Bruckner and PMC are ready and able to compete for, the Plaintiffs fail to allege facts demonstrating that they will be denied equal treatment. Pls.' Reply Supp. Am. Mot. for Prelim. Inj. at 28.

## IV.   CONCLUSION

The burden is on Bruckner and PMC to prove standing. *See Lujan*, 504 U.S. at 561; *Spokeo*, 578 U.S. at 338; *Susan B. Anthony List*, 573 U.S. at 158. "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of

---

[3] Although the parties dispute whether these third-party actions create redressability problems, I need not resolve that issue now because the Plaintiffs lack an injury in fact.

standing." *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990). If a plaintiff does not adequately allege an injury in fact, courts "should not speculate concerning the existence of standing," nor may they "imagine or piece together an injury sufficient to give plaintiff standing." *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229–30 (11th Cir. 2000). Because the Plaintiffs fail to allege facts clearly demonstrating that they are able and ready to compete in a discriminatory scheme, the Plaintiffs fail to demonstrate standing.

"Without jurisdiction the court cannot proceed at all in any cause." *Ex parte McCardle*, 74 U.S. 506, 514 (1868) (concluding that "the only function remaining to the court is that of announcing the fact and dismissing the cause"); *see also Ladies Mem'l Ass'n, Inc. v. City of Pensacola, Fla.*, 34 F.4th 988, 994 (11th Cir. 2022). Accordingly, the Defendants' motion to dismiss (Doc. 31) is **GRANTED**, and this action is **DISMISSED WITHOUT PREJUDICE**. The Plaintiffs' motion for a preliminary injunction (Doc. 17) is **DENIED** as moot. The Clerk is directed to terminate any pending motions and deadlines; to enter **JUDGMENT** in favor of the Defendants; and to **CLOSE** this case.

**ORDERED** in Tampa, Florida on March 31, 2023.

Kathryn Kimball Mizelle
United States District Judge